**GULF OIL COMPANY U. S.,**
Appellant-Appellee,

v.

**FIRST NATIONAL BANK OF HEREFORD,**
Appellant-Appellee.

No. 8395.

Court of Civil Appeals of Texas,
Amarillo.

Dec. 3, 1973.

Maloney, Milner & McDowell (Pat McDowell), Dallas, for appellant-appellee.

Witherspoon, Aikin, Langley, Woods, Kendrick & Gulley (E. Hazen Woods, Jr.), Hereford, for appellant-appellee.

ELLIS, Chief Justice.

This appeal presents for determination the priority of rights of (1) a purported attachment lienholder and (2) one claiming a lien as a secured party under the Texas Business and Commerce Code with respect to the proceeds from the sale of certain crops grown in 1971 by a defendant who is indebted to both claimants. The trial court's judgment awarding a portion of such proceeds to each creditor is challenged by both claimants, each contending its entitlement to all of the proceeds on the grounds that its asserted lien upon the portion of the 1971 crop proceeds awarded to the other party is superior to and should prevail over that of the other claimant. The judgment of the trial court is affirmed in part, and reversed and rendered in part.

The suit was originally instituted in the District Court of Deaf Smith County, Texas, by Gulf Oil Company U.S., as plaintiff, hereinafter referred to as "Gulf," seeking recovery against Charles R. Springer, as defendant, upon a promissory note given by Springer to Gulf. Gulf's original petition was filed on May 6, 1971, and citation was served upon Springer on June 21, 1971. Gulf obtained a default judgment against Springer, rendered on November 3, 1971, and filed for record on November 11, 1971. This judgment was designated as a "Final Judgment" decreeing recovery by plaintiff and the issuance of execution. Subsequent to the filing of the judgment on November 11, 1971, Gulf filed an "Affidavit for Attachment," and on the same date the district clerk issued an instrument purporting to be a Writ of Attachment. Also, according to the return shown on the instrument designated as a Writ of Attachment, filed with the County Clerk of Castro County, Texas, on November 12, 1971, and with the District Clerk of Deaf Smith County, Texas, on November 16, 1971, the deputy sheriff of Castro County, on November 11, 1971, levied upon certain milo maize belonging to Springer at Community Grain Elevator in Castro County.

On November 16, 1971, The First National Bank of Hereford, hereinafter referred to as the "Bank," filed its application for leave to intervene, seeking to quash Gulf's purported Writ of Attachment and an order establishing its asserted security interest as the first, prior and paramount lien with respect to the grain in question. A citation and copy of the Bank's application for intervention was served upon Springer on November 16, 1971, and the officer's return thereof was filed on November 17, 1971. A copy of the plea in intervention was mailed to Gulf's attorney on November 16, 1971.

The Bank alleged indebtedness owing to it by various outstanding promissory notes executed by Springer. The Bank further alleged that the Bank and Springer had executed a Security Agreement dated February 18, 1971, whereby Springer conveyed to the Bank a security in-

terest in the crops grown in 1971 upon the two tracts of land involved in this litigation. One of the tracts will be hereinafter referred to as the "leased" tract, a tract farmed by Springer as a tenant, while the other tract is owned by Springer and herein referred to as the "owned" tract.

The Bank claims a perfected security interest based upon a financing statement filed for record on July 5, 1966, specifically including as collateral crops grown and to be grown upon the "leased" tract and a continuation statement thereof filed on June 28, 1971. The Bank further insists that Gulf was charged with notice and knowledge of the security interest claimed with respect to the grain grown upon both tracts under the Security Agreement of February 18, 1971, and that subsequent to such notice the alleged attachment was issued and the purported levy upon the grain was made after the judgment in favor of Gulf was rendered on November 3, 1971.

On November 19, 1971, the defendant Springer filed his motion to vacate the default judgment rendered on November 3, 1971 and for a new trial alleging, among other matters, that: "(T)here are errors in Plaintiff's Attachment and Judgment which go to both the form and the substance and therefore it is in the best interest of justice and it is essential to the Defendant's case that said default judgment be vacated and that Defendant be granted a new trial on the merits." On November 19, 1971, the court entered its order reciting, among other matters:

" . . . it appearing to the Court both from the motion and evidence in support thereof, that said motion is in order. It is in all things granted; and said Default Judgment is hereby vacated and this case set back on the docket for trial."

This order was filed with the District Clerk of Deaf Smith County on November 19, 1971. Subsequent to the entry of above mentioned order granting his motion,

Springer filed Defendant's Original Answer on December 20, 1971. Thereafter, on March 6, 1972, Gulf filed its First Amended Original Petition seeking recovery upon the note described in its original petition.

After a hearing before the court without a jury, on May 24, 1972, the court entered its judgment on September 5, 1972, awarding to Gulf all of the proceeds of the grain grown in 1971 from both tracts here involved. On October 5, 1972, the court granted the Bank's motion for new trial insofar as it related to issues between Gulf and the Bank with regard to their respective alleged rights in the proceeds from the grain sold from the two tracts.

On March 22, 1973, the court, without a jury, heard the cause upon the record, including the pleadings, statement of facts and exhibits in the above mentioned hearing held on May 24, 1972. On March 30, 1973, the trial court entered its judgment in favor of Gulf against the defendant Springer on the note and awarded to Gulf "that portion of the sums of money now held in escrow at The First National Bank of Hereford pursuant to an escrow agreement between all parties, Plaintiff, Defendant and Intervenor, representing the net sales price of the grain sorghum delivered to the account of Defendant, Charles R. Springer, to the elevators of Community Grain, Inc., at Easter, Texas, being 783,923 pounds," such portion being found to be the sum of $15,678.40, and awarding to the intervenor Bank that portion of all the sums of money now held in escrow, representing the net sales price of the grain sorghum delivered to such elevators to Springer's account, being 415,660 pounds, such portion having been found to be the sum of $5,542.14. Both Gulf and the Bank have appealed from the judgment with respect to the division of the proceeds held in escrow. Springer, as defendant, did not appeal.

The record indicates that the proceeds from the sale of the 783,923 pounds of

grain awarded to Gulf was grown in 1971 upon the "owned" tract, while the proceeds from the sale of the 415,660 pounds of grain awarded to the Bank represents Springer's interest as tenant, after deducting the landlord's share, in grain grown by him in 1971 upon the "leased" tract. The record also shows that over a period of several years, as far back as 1966, Springer had borrowed money from the Bank and at no time from 1966 until the hearing on May 24, 1972 has Springer been free of debt to the Bank. The record further shows that Springer's total indebtedness to the Bank at the time of trial exceeded the total sum of the proceeds of the sale of the 1971 crops grown on both the "leased" and "owned" tracts.

On July 5, 1966, the Bank filed a financing statement with the County Clerk of Castro County, Texas, between itself and Springer as debtor, signed by both parties, covering, along with other collateral, all crops growing or to be grown on the "leased" tract. Thereafter, within five years, as required by Vernon's Texas Codes Annotated, Bus. & C. § 9.403,[1] on June 28, 1971, a continuation statement with respect to such financing statement was filed in the office of the County Clerk of Castro County. There is testimony in the record that Springer and the Bank executed a Security Agreement in 1966 and 1970 covering crops grown and to be grown on the "leased" tract. Also, Springer testified to the effect that he usually filed a security agreement at "the beginning of every fiscal year." The record contains a copy of the February 18, 1971 Security Agreement executed by the Bank and Springer including as collateral crops grown during 1971 and subsequent years upon both the "leased" and "owned" tracts. This Security Agreement was filed for record on November 12, 1971, the day following the purported issuance and levy pursuant to the Writ of Attachment issued on November 11, 1971.

Gulf, as appellant, asserts two points of error, contending that the trial court erred in awarding the Bank the proceeds from the "leased" tract because (1) Gulf had a superior lien by reason of its Writ of Attachment, on the grounds that the 1966 financing statement and its continuation do not constitute a perfected security interest in 1971 crops; and (2) the Bank does not have a superior lien on the proceeds of the grain from the "owned" tract because the 1966 financing statement did not include that land and the 1971 Security Agreement was not perfected prior to the levy on the Writ of Attachment. The Bank, as appellant, contends in its first five points of error that: (1) the purported Writ of Attachment was void; (2) no effective or proper levy was made with respect to the purported Writ of Attachment and thus no lien was created; (3) there was no evidence or (4) insufficient evidence to support any implied finding that there was an effective or proper levy; and (5) any implied finding that there was an effective or proper levy was so against the great weight and preponderance of the evidence as to be clearly wrong. The Bank's points of error nos. 6–8 are no evidence, insufficient evidence and against the great weight and preponderance of the evidence points relating to any implied finding of the court that there was no notice of the Bank's asserted prior security interest in all of such grain. The 9th point relates to the Bank's contention that, in any event, the asserted attachment lien had no priority with respect to $1,488 representing proceeds from the sale of a portion of the grain delivered to the elevator after the purported attachment levy.

A basic question for determination is whether the Writ of Attachment issued on November 11, 1971, after the original judgment rendered on November 3, 1971, was valid. The original judgment of November 3, 1971 recited proper service, that return of such citation of service had been

---

1. All references to section by number are to the specified section of Vernon's Texas Codes Annotated, Bus. & C.

filed for the required period of time, disposed of all issues between all of the then parties to the suit, and ordered that execution issue. Thus, at that point the judgment was a final judgment in that it had made a determination of all the rights of the parties to the suit and disposed of all issues then involved. North East Independent School District v. Aldridge, 400 S.W.2d 893 (Tex.1966); 33 Tex Jur 2d Judgments § 85 at 603 and cases cited therein. The file mark indicates that the judgment was filed on November 11, 1971 at 9:35 a.m. Thereafter, on the same day, Gulf made its application for a Writ of Attachment which was purportedly executed later on that same day according to the officer's return on the instrument.

It has been textually stated that the writ of attachment is not available before suit is filed nor after judgment is rendered, but it may be issued at any time in between. Lowe, Injunctions and Other Extraordinary Proceedings, (2d Ed. 1973) § 692 at 473–474; and Creditors' Rights in Texas, Attachment § 2 at 218, State Bar of Texas, Continuing Legal Education Program. In the case of Tanner v. Drake, 47 S.W.2d 455 (Tex.Civ.App.—Eastland 1932, no writ), it was held that attachment, a purely statutory remedy, is not authorized after the rendition of judgment. Chief Justice Hickman, speaking for the court, stated:

"This case grew out of a case of the same style, Tanner v. Drake [Tex.Civ. App., 47 S.W.2d 452], this day decided by us. After judgment had been rendered in that case in the court below in favor of defendant in error against plaintiffs in error for $17,500 as damages for personal injuries, the appellee filed an affidavit and bond in attachment and caused writs of attachment to issue thereunder, which were levied upon property belonging to plaintiff in error . . . Thereafter an order was entered in the court below foreclosing the purported attachment lien against said property and ordering that same be sold as under execution, and this writ of error

was prosecuted for the purpose of having this foreclosure order reviewed.

"[1–3] But little needs to be written. The procedure is without precedence. There was no suit pending upon which to base an attachment. A final judgment had been rendered prior to the filing of the affidavit and bond and issuance of the writ. Attachment is purely a statutory remedy, *and there is no statutory provision for the issuance of a writ of attachment after judgment.* It must be issued during the progress of the trial, with a single judgment awarding a money recovery and a foreclosure of the attachment lien." (Emphasis added)

█ It has been further held that, in Texas, the proceedings with respect to a writ of attachment are in the nature or an execution *before judgment.* Stewart v. Rockdale State Bank, 52 S.W.2d 915 (Tex.Civ.App.—Austin 1932, aff'd at 124 Tex. 431, 79 S.W.2d 116, 1935). Additionally, the writ of attachment, providing for an extraordinary remedy which is purely statutory, must be strictly construed. Tanner v. Drake, supra; Carpenter v. Carpenter, 476 S.W.2d 469 (Tex.Civ.App.—Dallas 1972, no writ). Although it may be regarded that there is language in some cases indicating that the right to a writ of attachment exists until the right to a writ of execution arises, yet in each such instance it is necessary to examine the specific facts. For example, in the case of Coleman v. Zapp, 135 S.W. 730 (Tex.Civ.App. —1911, aff'd at 105 Tex. 491, 151 S.W. 1040, 1912), involving a proceeding for revival of a dormant judgment, it is noted that the court determined that the dormant judgment was indeed a debt upon which no execution could issue, and the proceeding to revive it was nothing more than a suit for a debt and the attachment was accordingly authorized upon the filing of the secondary proceeding. In the case of J. M. Radford Grocery Co. v. Owenby, 34 S.W. 2d 385 (Tex.Civ.App.—El Paso 1930, no writ) the court pointed out that writs of

attachment and execution are essentially different in that the writ of attachment is for the purpose of seizing property and holding it in order that, if a judgment should be obtained, the property thus seized will be forthcoming to satisfy such judgment, while the writ of execution is a writ issued for the purpose of enforcing a judgment that has been obtained.

■ The judgment was rendered on November 3, 1971 providing that execution issue and, in this case, a writ of execution became available as soon as the judgment had been filed. Under Rule 628, Texas Rules of Civil Procedure, a writ of execution is available to the judgment holder within 20 days of the rendition of the final judgment "upon the filing of an affidavit . . . that the defendant is about to remove his personal property subject to execution by law out of the county, or is about to transfer or secrete such personal property for the purpose of defrauding his creditors." Gulf's affidavit for attachment contains substantially the same allegations as the basis for the writ of attachment. The Writ of Attachment was ineffective because it was issued after rendition of judgment, Tanner v. Drake, supra, and at a time when only a writ of execution was available to Gulf.

It is further noted that in the instant case a writ of attachment could have been issued after the judgment had been vacated and a new trial granted up until the time of rendition of another judgment thereafter, but that was not done. It is significant that under the holding of Tanner v. Drake, supra, if the original judgment had stood and had not been vacated, unquestionably the Writ of Attachment and purported levy would have been ineffective to create a lien. We do not consider that the fact that the judgment was subsequently vacated could have the effect of making the same attachment valid when it was unauthorized when issued. The status at the time of issuance and levy determines its effectiveness as a lien and not some subsequently changed condition. Article 300,

Vernon's Ann.Civ.Stat. Also, see Sanders v. Farrier, 271 S.W. 293 (Tex.Civ.App.— Texarkana 1924, writ dism'd), wherein the court held that the effectiveness and validity of an attachment is determined at the time of the levy. It is here recognized that on November 19, 1971, when the original judgment was vacated, and when upon proper affidavit and bond Gulf would have been entitled to secure another attachment, which was not done, the Bank had already filed for record its security agreement covering the collateral of the 1971 crops on both tracts on November 16, 1971. It is our opinion that the purported attachment lien was unauthorized at the time of its issuance and the levy thereon, and that Gulf is not entitled to assert the same as a valid creditor's lien which would be superior to the security interest created in behalf of the Bank by reason of its Security Agreement of February 18, 1971. The Bank's first point of error is sustained.

The Bank has presented additional points, evidentiary in nature, asserting in effect that, even in Gulf's Writ of Attachment be considered as authorized, the levy thereon was improper and ineffectual as a lien. We have reviewed the evidence in this area and have determined that a detailed discussion is not necessary. From an examination of the officer's return endorsed upon the Writ of Attachment filed on November 12, 1971, we find the description of the property levied upon as being the property of Charles R. Springer, defendant, at Easter, Castro County, Texas, and additionally described as: "All Milo Maize belonging to Charles R. Springer at this time 11/11/71 4:25 P.M. Last Ticket #06608 . . . COMMUNITY GRAIN ELEVATOR SIX MILES NORTH & FIVE MILES WIST (sic) OF DIMMITT TEX." is sufficiently certain to identify, as being subject to the levy, any grain at such elevator belonging to Springer at the time designated. Rule 606, T.R.C.P. Although it is indicated that the ticket #06608 may not be the correct number as a ticket pertaining to the Springer account, it is our opinion that from a con-

sideration of the entire return, it is manifested that the officer was levying upon all of the Springer grain in the above mentioned elevator at the time designated. We overrule the Bank's points of error 2–5 concerning the lack of evidence to support the implied finding regarding the purported levy, in the event of a determination that the issuance of the purported Writ of Attachment was authorized by law.

▇ In its points of error nos. 6–8 the Bank, in effect, asserts that even if Gulf's claim of a creditor's lien based upon the purported attachment and levy be considered as valid, the Bank had a prior security interest in the proceeds from all of the 1971 grain produced from both the "leased" and "owned" tracts. From a review of the trial court's judgment, it is apparent that the court considered the Bank's asserted security interest with respect to the proceeds from the "leased" tract superior to Gulf's asserted attachment lien, while Gulf's attachment lien was regarded as superior to the security interest claimed by the Bank with respect to the remainder of the proceeds from the sale of the grain. Gulf challenges that portion of the judgment apparently recognizing the superiority of the Bank's security interest in the proceeds from the "leased" tract which included as collateral crops grown and to be grown therefrom as described in the 1966 financing statement. Gulf insists that the 1966 financing statement and its continuation does not create a perfected security interest in the 1971 crops grown upon the land therein described.

Section 9.403 provides for the filing of a financing statement and a renewal every five years. Gulf contends that the Bank does not have a lien on the 1971 crops because the special requirements of § 9.-204(d) which provides that no security interest attaches under an after-acquired property clause with respect to crops which become such more than three years after the security agreement is executed. Gulf further contends that the crops in dispute here were grown and harvested in 1971, more than five years after the execution of the security agreement. Apparently, Gulf does not distinguish between a financing statement and a security agreement. It is here observed that a person is charged with notice by virtue of the filing of a financing statement. The financing statement does not set forth any of the terms of the indebtedness. It is a notice in short summary form placing the world on notice, and the continuation statement continues the effectiveness of the financing statement. §§ 9.402 and 9.403(c). Also, under § 9.204, a security interest is created by the security agreement. The evidence of this case indicates that from 1966 and throughout all material times involved herein, Springer had executed from time to time security agreements in favor of the Bank to secure outstanding indebtedness. Springer testified that he usually filed a security agreement at the beginning of each fiscal year. Further, there is evidence in the record that Springer never completely paid his indebtedness at the end of each year. The security agreement relied upon by the Bank in the instant case is that of February 18, 1971, signed by a representative of the Bank and Springer which includes as collateral the 1971 crops on both the "leased" and "owned" tracts. As soon as the crop was planted in 1971 the security interest attached. § 9.204(b). Certainly the security interest in the crop attached within three years after the *execution of the security agreement*, and the special limitations of § 9.204(d) were met in order that the security interest became established. The security interest was perfected by the filing of the continuation statement in June, 1971, thus continuing in effect the 1966 financing statement with respect to the "leased" tract. Since this security interest of the Bank was perfected prior to the issuance of Gulf's purported attachment and levy thereunder, such security interest had priority with respect to the proceeds of the 1971 crops grown on the "leased" tract.

Although as of the date of the levy on the Writ of Attachment there was no financing statement filed of record describing as collateral crops grown or to be grown on the "owned" tract, yet the Bank had a security interest by reason of its compliance with the provisions of § 9.-203(a)(2). The February 18, 1971 security agreement included not only the "leased", but also the "owned" tract, and thus the Bank had established the security interest although at the time of the issuance of the purported attachment and levy such security interest as to the "owned" tract was not perfected. The U.C.C. (Texas Bus. & C.) does not require that a security interest be perfected by filing or otherwise in order to be valid. Security Bank of Oregon v. Levens, 257 Or. 630, 480 P.2d 706 (1971); also see Branch v. Steph, 389 F.2d 233 (10th Cir. 1968).

With regard to the proceeds of the grain sorghum produced from the "owned" tract, the Bank contends that although its security interest was not perfected by filing as of the time of levy under Gulf's purported attachment, Gulf had actual knowledge and notice of the Bank's established security interest in the crops grown and the proceeds from such tract. § 9.301 provides that an unperfected security interest is subordinated to the rights of "  .  .  . a person who becomes a lien creditor *without knowledge of the security interests* and before it is perfected;" (Emphasis added). Section 1.201 provides in part:

"(25) A person has 'notice' of a fact when

"(A) he has actual knowledge of it; or"

\*     \*     \*     \*     \*     \*

"(C) from all the facts and circumstances known to him at the time in question he has reason to know that it exists.

"A person 'knows' or has 'knowledge' of a fact when he has actual knowledge of it."

\*     \*     \*     \*     \*     \*

"(27) Notice, knowledge or a notice or notification received by an organization (business entity) is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction, and in any event from the time when it would have been brought to his attention if the organization had exercised due diligence."

There is evidence in the record showing, in effect, that Gulf had actual notice or was charged with knowledge of the Bank's security interest not only in the crops and proceeds thereof from the "leased" tract, but also with respect to the "owned" tract. The Security Agreement of February 18, 1971, which established the security interest, included the 1971 crops grown or to be grown on both tracts. There is testimony by the loan officer of the Bank to the effect that on several occasions during the summer of 1971 he advised officers of Gulf that the Bank had a security interest in the grain here in question. Also, there was testimony pertaining to various attempted negotiations between Gulf and the Bank concerning the Bank's paying off Springer's indebtedness on his fertilizer account with Gulf. Further, the operator of the elevator testified that prior to the purported attachment levy, he advised the deputy sheriff and the collection agent who had received the Springer account from Gulf that the Bank had a lien upon the stored grain belonging to Springer. Also, the collection agent testified that he examined the record and discovered the filing of the financing statement and the continuation statement. After this notice of the filing and other information furnished concerning the security interest claimed by the Bank, in view of the above cited provisions of the Bus. & C. Code, Gulf was charged with the obligation of using due diligence to discover and secure full information as to the basis for the Bank's claimed security interest in all of the grain stored in the elevator. From our review of the evidence

and the applicable provisions of the Business and Commerce Code, it is our opinion that there is no evidence of probative force to support any implied finding that Gulf was not on notice or charged with actual knowledge or the obligation to secure knowledge of the Bank's established security interest in the proceeds of the sale of the grain from both tracts described in the February 18, 1971 Security Agreement.

In view of the foregoing we overrule Gulf's points of error nos. 1 and 2 and sustain the Bank's point of error no. 6. We do not reach the Bank's points nos. 7 and 8, but if reached they would be sustained. Since we have sustained the Bank's claim to the proceeds from all the grain produced in 1971 from both tracts, we do not reach the Bank's 9th point concerning that portion of the grain allegedly sold after the time of the purported levy under the Writ of Attachment.

There is no contention that the case has not been fully developed, and it is the duty of this court to render the judgment the trial court should have rendered. Rule 434, T.R.C.P. Since we have held that the purported levy upon the attachment of November 11, 1971 created no lien in favor of Gulf, and further, that even if the attachment lien were considered valid, the security interest established by the Security Agreement of February 18, 1971, was perfected as to the proceeds from the "leased" tract, and that Gulf was charged with knowledge of the security interest created thereby as to the "owned" tract, it is our opinion that the Bank is entitled to be paid the entire sum of the proceeds of the grain sold from both tracts.

That portion of the judgment rendered in favor of Gulf Oil Company U.S., plaintiff, on its note executed by Charles R. Springer, including principal, interest, attorney fees, statutory interest and costs, all as set out in the trial court's judgment of May 24, 1973, with execution, is affirmed. That portion of the judgment awarding Gulf the proceeds from the sale of 783,923

pounds of the grain in the sum of $15,678.40 is reversed, and judgment is rendered that the Bank be awarded the entire proceeds from the sale of the 1,199,583 pounds of grain delivered for Springer's account to the elevators of Community Grain, Inc., at Easter, Texas, in the total sum of $21,220.54, such sum to be paid to the Bank pursuant to the escrow agreement between Gulf, the Bank and Springer, together with execution in favor of the Bank with all costs of appeal taxed against Gulf.

Affirmed in part and reversed and rendered in part.