In re **Ralph Jerome KRUSE, Armelia Marie Kruse, Debtors.**

**Bankruptcy No. 83–40026.**

United States Bankruptcy Court, D. Kansas.

Dec. 28, 1983.

Dan E. Turner, Topeka, Kan., for debtors.

Patricia A. Reeder, Eidson, Lewis, Porter & Haynes, Topeka, Kan., for creditor.

## MEMORANDUM OF DECISION

JAMES A. PUSATERI, Bankruptcy Judge.

In this chapter 11 proceeding, the Court must determine the extent of a creditor's

lien in entitlements received by the debtor pursuant to the United States Government's Payment-In-Kind program.

The debtors are represented by Dan E. Turner, Topeka, Kansas. The creditor, Northwest Kansas Production Credit Association (PCA) is represented by Patricia A. Reeder of Eidson, Lewis, Porter & Haynes, Topeka, Kansas.

The issues presented for determination are:

1. Does federal common law or state law govern private debtor-creditor relations under the Department of Agriculture's Payment-In-Kind (PIK) program.

2. To what extent did the debtors grant PCA a security interest in their crops.

3. To what extent does a creditor have an interest in a debtor's PIK entitlements and what effect does bankruptcy have on these rights.

Briefs have been submitted and the Court is ready to rule.

## FINDINGS OF FACT

### 1. Transactions Between PCA and the Debtors

On October 4, 1982 the debtors and PCA executed a renewal note (creditor's exh. 1) in the amount of $680,266.08 of which $621,860.95 represented a renewal of existing indebtedness.

On April 29, 1982 the debtors executed a security agreement granting PCA a security interest in the following collateral:

Cane, Corn & Wheat

Owned: NW ¼ 7–11–32, SE ¼ 12, N ½ 13, SE ¼ 13, S ½ 25, 11–33 Logan County, Kansas

Leased: SE ¼ 1, NE ¼ 12, 11–33 & SW ¼ 12–13–34 Logan County, Kansas.

19,111 bu. Wheat CCC reserve

49,000 bu. 81 Milo CCC reserve

3,722 bags Pinto beans

1,500 ton Wheat Silage

150 bales Wheat

250 bales Wheat & weeds

150 bales Milo

In addition, the debtors granted a security interest in:

all additions, accessions, replacements, substitutions, proceeds and products therefrom including natural increase of livestock and any and all property of similar type or kind now owned or hereafter acquired by the Debtor and used for either personal, family or household purposes; farming or ranching operations; or any other business in which the Debtor is or might be engaged.

(creditor's exh. 2).

The security interest was granted:

to secure payment and performance of all obligations, indebtedness, and liabilities of any kind, whenever and however incurred, absolute or contingent, due or to become due, now existing or hereafter arising of the Debtor to the Secured Party, including the liabilities arising because of funds advanced at the option of the Secured Party.

Id. The debtors specifically granted "a *present* security interest" in the collateral mentioned. Id. (emphasis added) A security agreement was not executed in 1983.

The debtor, Ralph Kruse, has submitted an affidavit stating that approximately $2,500 of the 1982 loan from PCA was used to prepare and plant the crops to be harvested in 1983.

The debtors filed their chapter 11 petition on January 4, 1983. On April 25, 1983 the debtors applied for authority to participate in the PIK program. On May 16, 1983 an Order was entered allowing the debtors to participate.

### 2. Payment-In-Kind

In the past two years, United States and world grain production have reached record levels, while farmers have been adversely affected by weak economic conditions in the United States and the world, spiralling interest rates and inflation, financial instability in a number of countries, the Soviet embargo, continued East-West tensions, and restrictive market actions by some foreign buyers. Rising world production in the face of weakened demand has led to a sharp accumulation in world grain stocks. In the United States, stocks of nearly all

major grain commodities have increased dramatically. Current stocks of rice and feed grains are nearly three times greater than stocks existing two years ago. The increased supply of grain has driven down the price of grain, in a textbook example of the economic law of supply and demand. As prices have dropped, the already marginally profitable American farmer, has been forced to increase production in an effort to stay afloat. This cycle, combined with recent economic trends, has placed an increasing strain on farmers.

In an effort to affect grain prices by altering supplies, the United States Department of Agriculture's Agricultural Stabilization and Conservation Service (ASCS) began to administer the 1983 Payment-In-Kind (PIK) program for wheat, corn, grain sorghum, upland cotton and rice. This program, although not easily explained, is summarized as follows.

The PIK program builds on the existing 1983 Wheat and Feed Grain programs. Under existing programs, producers who plant one or more program crops (wheat, corn, grain sorghum, barley or oats) and participate in and comply with the acreage reduction and land diversion program for a crop are eligible for program benefits. The existing program benefits include land diversion payments, commodity loans, target price protection and any disaster payments that may be authorized for that crop. Producers who participate in the acreage reduction and/or paid land diversion programs for one or more of the 1983 crops of wheat, corn, grain sorghum, upland cotton, or rice may also participate in the PIK program. Under the PIK program, the producers will receive a quantity of pounds or bushels of the same commodity as specified below from Commodity Credit Corporation (CCC) for an additional acreage reduction (PIK Acreage) by:

a. making an *additional* reduction in the acreage of the crop permitted to be planted from 10%–30% of the crop acreage base and devoting an equivalent acreage to approved conservation uses, or

b. withdrawing the entire crop acreage base from production and devoting an equivalent acreage to approved conservation uses if a whole base bid is accepted by CCC.

Alternative "a" is commonly referred to as "percent of base PIK" and alternative "b" is commonly called "whole base PIK." After the Court entered its Order authorizing the debtors to participate in the PIK program, the debtors applied to participate in whole base PIK.

There were several requisites to the debtors' participation in the whole base PIK program. First, the debtors' farm had to be enrolled in the existing 1983 acreage reduction program for the program crop and, for wheat, corn, sorghum and rice, the paid land diversion program. The debtors plant and produce wheat, corn and milo, and thus were required to participate in both the 1983 acreage reduction program and the paid land diversion program. Upon enrollment in existing programs, PIK required the debtors to reduce acreage in addition to the basic 1983 acreage reduction program.

Second, PIK required the debtors to submit a "bid" by executing a PIK contract for the farm no later than March 11, 1983. The "bid" is actually the debtors' indication of the percent of the farm's program yield per acre that constitutes an acceptable compensation for withdrawing the whole crop acreage base from production. Any producers who would have shared in the crop had it been produced on the farm were required to agree to and sign the PIK contract. Upon execution, the contract was filed with the county ASCS committee. The debtors submitted bids of 93% for wheat, 74% for corn, and 74% for milo. These bids were accepted.

Third, the debtors' PIK contract was required to provide that *no* acreage of the program crop would be planted for harvest on the farm. PIK required that acreage of eligible land equal to the entire crop acreage base must be devoted to approved conservation uses.

The acreage used to compute PIK compensation is:

a. ninety percent (90%) of the crop acreage base for corn and grain sorghum; and

b. ninety-five percent (95%) of the crop acreage base for wheat and rice.

PIK compensation is computed by initially multiplying the PIK acreage times the percent of the farm's program yield bid. This amount, in turn, is multiplied by a figure which has been determined as the farm's "effective yield." The result is the number of bushels of PIK grain the farm producer will receive.

The PIK calculations obtained from the county ASCS office for the debtors are agreed to by the parties and are set forth as follows:

| Crop Acreage Base | | % of Crop Acreage Base Used to Compute PIK Compensation | | Eligible Acres | | Bid | | Yield | | Bushels PIK |
|---|---|---|---|---|---|---|---|---|---|---|
| Wheat 322.7 acres | x | 95% | = | 306.5 | x | 93% | x | 41 | = | 11,687 bu. |
| Corn 235.5 acres | x | 90% | = | 212 | x | 74% | x | 119 | = | 18,668 bu. |
| Milo 579.5 acres | x | 90% | = | 521.5 | x | 74% | x | 84 | = | 32,416 bu. |

The following dollar figures are illustrative of the values of the PIK payments, as agreed by the parties. The illustration does not necessarily reflect today's current prices:

| | | | | | |
|---|---|---|---|---|---|
| Wheat | 11,687 bu. | @ | $3.20 | = | $ 37,398.40 |
| Corn | 18,668 bu. | @ | 2.65 | = | 49,470.20 |
| Milo | 32,416 bu. | @ | 2.25 | = | 72,936.00 |
| | | | | | $159,804.60 |

(These figures are somewhat overstated as they are the total amounts and do not reflect the landlord rent share. In addition, these figures are subject to a change in the market price.)

In addition, the debtors are probably eligible for land diversion payments as follows:

| | Base | | % Diversion Payment | | Yield | | Diversion Support Price | | |
|---|---|---|---|---|---|---|---|---|---|
| Wheat | 322.7 acres | x | 5% | x | 41 bu. | x | $2.70 bu. | = | $ 1,786.00 |
| Corn | 235.5 acres | x | 10% | x | 119 bu. | x | $1.50 bu. | = | 4,203.00 |
| Milo | 579.5 acres | x | 10% | x | 84 bu. | x | $1.50 bu. | = | 7,302.00 |
| | | | TOTAL LAND DIVERSION PAYMENTS | | | | | | $13,291.00 |

The PIK regulations will be codified at 7 CFR 770.1 to 770.6. At present, they can be found at 48 Fed.Reg. 1476–79 (Jan. 12, 1983); 48 Fed.Reg. 1694–97 (Jan. 14, 1983); and 48 Fed.Reg. 9232–34 (March 4, 1983). Two provisions are pertinent. Section 770.-6(e) provides:

Assignments with respect to quantities of a commodity which can be received by a producer as payment in kind will be recognized by the Department only if such assignment is made on Form CCC–479, Assignment of Payment-In-Kind, executed by the assignor and assignee, and filed with the county committee.

Section 770.6(f) provides:

Except as provided in paragraph (e) of this section, any payment in kind or portion thereof which is due any person shall be made without regard to questions of title under state law, and without regard to any claim of lien against the commodity, or proceeds thereof which may be asserted by any creditor.

## CONCLUSIONS OF LAW

### 1. Choice of Law

■ Federal law governs questions involving rights arising under nationwide federal programs, unless the federal law requires otherwise. *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). Nevertheless,

[c]ontroversies directly affecting the operations of federal programs, although governed by federal law, do not inevitably require resort to uniform federal rules.... Whether to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law.

Id. at 727–28, 99 S.Ct. at 1458. The courts must consider the need for uniformity, the extent to which application of a federal rule would disrupt commercial relationships predicated on state law, and the extent to which application of state law would frustrate specific objectives of the federal program.

■ Just as the Supreme Court held in *Kimbell Foods,* this Court believes,

the state commercial codes 'furnish convenient solutions in no way inconsistent with adequate protection of the federal interests ....'

Id. at 729, 99 S.Ct. at 1459. The Court declines "to override intricate state law of general applicability on which private creditors base their daily commercial transactions." Id. The Court does not believe application of state law in any way hinders the Government's attempt to stabilize the supply and demand problems through PIK. Furthermore, the Uniform Commercial Code is adopted in 49 states, and is itself a type of non-federal, national policy. Accordingly, under the rule of *Kimbell Foods,* state and not federal common law will govern resolution of the issues at bar.

### 2. Extent of Security Interest

■ The debtors granted "a *present* security interest" in their crops, and argue the April, 1982 security interest was not intended to extend to crops planted in 1982 and to be harvested in 1983. The Court cannot agree. The Court holds the term "present" is used to distinguish the security interest from one in which attachment is postponed pursuant to K.S.A. § 84–9–203(2) (1983). For a discussion of postponed attachment, see *Allegaert v. Chemical Bank,* 657 F.2d 495, 503–04, 29 UCC Rep. 993 (2nd Cir.1980). The Court believes the use of the word "present" was intended to indicate that the parties agreed to a security interest immediately attaching in April, 1982, and did not bear on whether the security interest would attach to property acquired or planted after April, 1982 nor does the Court believe it bears on when the security interest would terminate. This holding is supported by the existence of the after acquired property clause in the instant agreement. This after acquired property clause shows the parties' intent that the security was not limited to collateral in existence in April, 1982, but rather extended to crops planted after April, 1982.

### 3. Creditor's Rights Under PIK

There are four cases relevant to the issue of a secured party's rights under PIK. In *Pombo v. Ulrich (In Re Munger),* 495 F.2d 511, 14 UCC Rep. 790 (9th Cir.1974), a sugar beet farmer gave a security interest in equipment, crops and proceeds to a secured party, and later assigned subsidy payments to be received from the Department of Agriculture either for harvesting or not harvesting a planted sugar beet crop.

Prior to filing a bankruptcy petition, the farmer abandoned part of his crop and applied for abandonment payments. After filing a bankruptcy petition, the debtor applied for other subsidy payments. The court stated:

... we assume that the security agreements were drafted with an awareness of the importance of the various forms of federal subsidy payments to the realities of financing a farming operation based upon sugar beets, and that an interested third party could also be expected to know that the crops described were sugar

beets and entitled to various conditional subsidy payments under the Sugar Act of 1948.

495 F.2d at 513. The court held the abandonment payments were proceeds of the creditor's interest in the planted sugar beet crop. The court also held subsidy payments based on the sale and supply of sugar beets were proceeds of the planted sugar beet crop. Accordingly, the court held the secured party had a security interest in the government-sponsored entitlement payments. See B. Clark, The Law of Secured Transactions Under the Uniform Commercial Code, ¶ 18.5[1][a] at 8–49 (1980).

In *First State Bank of Abernathy v. Holder (In Re Nivens)*, 22 B.R. 287, 34 UCC Rep. 1711 (Bkrtcy.N.D.Tex.1982), cotton farmers were entitled to receive deficiency and low yield/disaster payments from the Department of Agriculture under a 1981 support program. The entitlement payments were based on crops planted prior to the filing of the bankruptcy petition. The court held the disaster checks were a substitution for proceeds of crops "which logically would have been received had the disaster or low yields not occurred." 22 B.R. at 291.

As for the deficiency payments, the court held:

> ... deficiency payments are made, because it is determined that farmers should receive a target price for the crop. The crop lien includes lien on the proceeds and the deficiency payments are monies from the government which make up the difference between the amount of money actually received for the crop and that amount which the Department of Agriculture has determined on a nationwide basis, that a producer should receive for a particular crop. It is logical to conclude that the deficiency payments are substitute for proceeds of crops.

Id. at 291–92. Accordingly, the court held the secured party had a security interest in both disaster and deficiency payments.

In *In Re Sunberg*, 35 B.R. 777 (Bkrtcy. S.D.Iowa 1983) the debtors had a multifaceted farming operation and grew corn and soybeans as cash crops. PCA had a perfected security interest in crops, growing crops, farm products, contract rights, accounts and general intangibles existing or hereafter acquired.

The debtors applied to enter the PIK program on February 9, 1983 and agreed to divert 57 corn base acres in return for a payment of 2,212 bushels of corn. The agreement was approved by the Commodity Credit Corp. (CCC) on March 16, 1983. On March 9, 1983 the debtor agreed to divert other farming acres in return for payment of 9,940 bushels of corn. This was also approved by CCC on March 16, 1983. On April 12, 1983 the debtors filed a chapter 11 bankruptcy petition.

The court first held:

> ... PCA ... and the Debtors ... [b]oth would have to be conscious of the impact of the various farm programs in existence or that might come into existence on the farmer borrower's ability to meet his financial obligations.

At 781. Thus, future entitlements were covered under an after acquired property clause. See UCC § 9–204.

The court next held that the debtor's contractual right to a payment in kind was a general intangible under UCC § 9–106 in which PCA had a perfected security interest. At 781–783. The court stated:

> The Debtors' reliance of [sic] 11 U.S.C. § 552 is also untenable. Section 552(a) permits the avoidance of liens of property acquired by the estate or by a debtor after the commencement of a case. Here, the contract, general intangible collateral, was in existence prior to bankruptcy.

At 783. Furthermore, property (bushels of grain) received by way of the PIK program was non-cash proceeds of the contract right (general intangible) and within the exception of 11 U.S.C. § 552(b) allowing a security interest to extend to certain proceeds received by the debtor after a bankruptcy petition was filed. At 783–784. According, the Iowa court held PCA had a security interest in the debtor's PIK entitlement.

In *In Re Preisser,* 33 B.R. 65, 10 BCD 1306 (Bkrtcy.D.Colo.1983) the court held that a real estate mortgagee's deed of trust on land and rents, issues and profits derived from the land extended to PIK entitlements as rents or profits of the land. The case does not indicate whether the creditor complied with the UCC; the case does not address the effect of the UCC on the transaction; the case does not indicate when the debtor applied to enter the PIK program. Without knowing whether the creditor complied with the UCC and when the debtor entered the PIK program, the case is factually deficient, of minimal precedential value, and this Court declines to follow its holding. Moreover, the UCC and not the law pertaining to real estate mortgages governs secured financing of crops. See, e.g., *United States v. Newcomb,* 682 F.2d 758, 33 UCC Rep. 1748 (8th Cir.1982); B. Clark, supra ¶ 8.5[1][a] at 8–46 to –47.

Furthermore, following the holdings of *In Re Nivens,* supra, and *In Re Munger,* supra, PIK regulations sections 760.6(e), (f) do not affect a creditor's security interest in PIK payments. *In Re Nivens,* 22 B.R. at 291; *In Re Sunberg,* supra, at 785.

To summarize, agricultural entitlement payments made to a debtor when the debtor agrees to abandon a planted crop, low yield/disaster payments made to supplement a planted crop, and subsidy payments made to supplement a planted crop are all proceeds of the planted crop under the Uniform Commercial Code and subject to a creditor's security interest in the crops out of which the payments arose. See *In Re Munger,* supra; *In Re Nivens,* supra. A diversion agreement between the farmer and the Department of Agriculture in which the farmer agrees to turn under or abandon a planted crop and/or not plant certain acreage, is a general intangible as is the farmer's right to receive payments under the diversion agreement. The payments themselves are proceeds of the general intangible and subject to a creditor's security interest in the general intangible. *In Re Sunberg,* supra.

Turning to the instant case, the Court holds that the debtors and PCA contemplated subsidy programs in executing their security agreement as discussed in *In Re Munger,* supra, 495 F.2d at 513, and *In Re Sunberg,* supra, Slip Op. at 8.

A security interest in crops attaches when crops are planted. *First Nat'l. Bank of Colo. Springs v. Hamilton (In Re Hamilton),* 18 B.R. 868, 8 BCD 1116, 6 CBC2d 482 (Bkrtcy.D.Colo.1982); *In Re Melton,* Case No. 82–40840 (Bkrtcy.D.Kan. 1983); *United States v. Greenwich Mill & Elevator Co.,* 291 F.Supp. 609, 5 UCC Rep. 965 (N.D.Ohio 1968); *United States v. Minster Farmers Coop. Exchange, Inc.,* 430 F.Supp. 566, 21 UCC Rep. 1439 (N.D.Ohio 1977); *Gulf Oil Co., U.S. v. First Nat'l. Bank of Hereford,* 503 SW2d 300, 13 UCC Rep. 715 (Tex.Civ.App.1973). At the time the debtors filed their bankruptcy petition, they had already planted certain crops. Therefore, at the time the debtors filed their petition PCA had a lien on the planted crops.

Government entitlement payments including PIK payments are proceeds of planted crops. See *In Re Munger,* supra; *In Re Nivens,* supra. The extent of a creditor's security interest in bankruptcy is governed by 11 U.S.C. § 552 which provides:

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

(b) Except as provided in sections 363, 506(c), 544, 545, 547 and 548 of this title, if the debtor and a secured party enter into a security agreement before the commencement of the case and if the security interest created by such security agreements extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable non-bankruptcy law, except

to the extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. § 552. Any PIK payments received on account of these planted crops subject to PCA's lien prior to the filing of the bankruptcy petition are proceeds of the pre-bankruptcy planted crops and subject to the PCA security interest. See 11 U.S.C. § 552(b). The debtors indicated they only used $2,500 of PCA's loan to plant the crops that were growing when their chapter 11 bankruptcy petition was filed. This, however, is not the operative extent of PCA's lien. Rather, the Court holds PCA has a lien on whatever PIK entitlements were received by the debtors on account of the crop that was planted at the time the bankruptcy petition was filed, and that was subsequently turned under and/or abandoned pursuant to the PIK program.

■ In addition, the debtors agreed not to farm the rest of their acreage in return for PIK entitlements. There were no planted crops out of which this agreement arose. Rather, this was an agreement not to plant. PCA is not entitled to any of these PIK entitlements for two reasons.

First, PCA's security agreement does not grant a security interest in general intangibles or contract rights, unlike the security agreement in In Re Sunberg, supra.

Second, even if PCA had a security interest in general intangibles, when the debtors filed their bankruptcy petition, there were no existing general intangibles in the form of entitlements pursuant to a PIK contract because the debtors did not enter the PIK program until after they filed their bankruptcy petition. This fact distinguishes the instant case from In Re Sunberg where the debtor entered the PIK program and had existing general intangibles before filing their bankruptcy petition.

Pursuant to § 552, property acquired by the estate after commencement of the case is free of a security interest unless the post-commencement property is proceeds of encumbered property acquired by the debtor before the commencement of the case. In In Re Sunberg, the debtor acquired rights under the PIK agreement before commencing his bankruptcy case. The rights under the PIK agreement was a general intangible in existence before the bankruptcy petition was filed. Grain received by the debtor on account of his PIK agreement was proceeds of the PIK agreement acquired after the bankruptcy petition was filed, and pursuant to § 552(b), the creditor's security interest continued in the proceeds (PIK grain). By contrast in the instant case, the debtors had no rights under the PIK program when they commenced their bankruptcy case. They did not enter PIK until after commencing their bankruptcy case. To this Court's knowledge, no court has ever held that the rights under PIK, or any other entitlement program, stemming from an agreement not to grow crops, are proceeds of anything. Of what could it be proceeds? These payments were made if the debtors agreed not to create collateral. The only "collateral" available to PCA is the general intangible in the nature of the right to receive payments under PIK. Thus, the only collateral there is, the rights under PIK, the general intangible, were acquired by the estate after the petition was filed and pursuant to § 552(a), was free of any pre-bankruptcy liens. If the collateral itself was free of pre-bankruptcy liens, then any proceeds of the collateral must also be free of pre-bankruptcy liens, 11 U.S.C. § 552(b).

To summarize, the Court holds PCA has a lien on any PIK payments received by the debtors on account of crops planted before the debtors filed their bankruptcy petition.

The Court further holds PCA does not have a lien on any other PIK payments received by the debtors because PCA does not have a security interest in general intangibles. Even if PCA had a security interest in general intangibles, the rights under the PIK agreement which is a general intangible, were acquired by the debtors after commencing their bankruptcy case and the general intangible as well as any proceeds of the general intangible are free of PCA's pre-bankruptcy lien pursuant to § 552(a).

The foregoing constitutes Findings of Fact and Conclusions of Law under Bankruptcy Rule 7052 and Rule 52(a) of the Federal Rules of Civil Procedure.