In re Frank GEORGE, Sr. and Ellen George, Debtors.

Frank GEORGE, Sr. and Ellen George, Petitioners,

v.

FARMERS HOME ADMINISTRATION, Respondent.

Bankruptcy No. 185–02449.

United States Bankruptcy Court, C.D. Illinois.

July 16, 1986.

Barry M. Barash, Barash, Stoerzbach & Henson, Galesburg, Ill., for debtors.

L. Lee Smith, Asst. U.S. Atty., Peoria, Ill., for U.S., acting through Farmers Home Admin.

## ORDER

WILLIAM V. ALTENBERGER, Bankruptcy Judge.

This matter came on to be heard on the Debtors' petition for reimbursement of crop expense. The facts are not in dispute and were orally stipulated to as follows:

On May 1, 1985, the Farmers Home Administration (Farmers) loaned the Debtors $100,000.00 and perfected a security interest in Debtors' 1985 crop. The crops were planted in the spring of 1985. On October 21, 1985, the Debtors filed for protection under Chapter 11 of the Bankruptcy Code, and on December 26, 1985, pursuant to the order of this court the debtors "sealed" their 1985 corn crop pursuant to the government's Commodity Credit Corporation's (CCC) price support program, receiving a non-recourse loan in the amount of $79,945.53. Under this program, the CCC loaned the Debtors money at a pre-determined per bushel rate for corn. If the price rose above the loan rate, the Debtors could sell the corn on the open market and repay the loan. However, if the price stayed below the loan rate, the Debtors could "seal" the corn at the subsidized rate, thereby realizing a profit that Debtors otherwise would not be able to obtain. After "sealing", the corn became the property of the CCC. The Debtors were also automatically entitled to receive an additional deficiency payment of 48 cents per bushel. The Debtors obtained a loan at the rate of $2.59 per bushel. The market rate

was then $2.30 per bushel [1]. resulting in a "sealing profit" of 29 cents per bushel.

The Debtors received a check from the CCC in the amount of $111,870.11 payable jointly to the debtors and Farmers. The Debtors then filed a petition for reimbursement of crop expense pursuant to Section 506(c) of the Bankruptcy Code and therein asked that they be allowed to pay from that amount certain expenses totaling $30,-044.58, pay to Farmers the sum of $73,-125.53, which the Debtors do not deny that Farmers is entitled to, and asked this court to rule on whether the Debtors or the Farmers are entitled to the $8,700.00 of "sealing profit" based upon 30,000 bushels of corn at 29 cents per bushel.

Section 552(b) of the Bankruptcy Code provides that if a debtor and a creditor entered into a security agreement before the commencement of the case which grants a security interest in products of the collateral, then such security interest extends to such products of the collateral acquired by the estate after the commencement of the case to the extent provided by the security agreement or applicable non-bankruptcy law

> "except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise."

The Debtors take the position that they are entitled to the whole $8,700.00 on the theory that Section 552(b) cut off, as of the date of the filing of the Chapter 11 proceedings, Farmers' pre-petition security interest in post petition earnings. Specifically, the Debtors contend that Farmers does not have a security interest in the "sealing" profit because:

a. The sealing profit arose post-petition, 11 U.S.C. § 552(b).

b. The privilege of sealing was personal to the debtors and did not extend to the secured party.

c. The debtors voluntarily obtained a loan on the crop and were under no compulsion so to do.

d. The secured party was ineligible to participate in the programs of the Commodity Credit Corporation and to seal grain.

e. The debtors were eligible to voluntarily participate in the programs of the Commodity Credit Corporation with respect to the sealing of grain.

f. The sealing profit is property of the estate 11 U.S.C. § 541(a)(7) ("such estate is comprised of ... [a]ny interest in property that the estate acquires after the commencement of the case").

Farmers takes the position that the "equity exception" of Section 552(b) has been narrowly limited to cases where the debtor in possession uses other assets of the estate (besides the secured creditors) to produce a profit, and that this did not occur in this particular case, and it would be inequitable to permit debtors to reap all of the profit which the Farmers' loan created.

The Debtors' brief accurately sets forth the meaning given to the equity exception. The Debtors quote from *Collier on Bankruptcy*, 15th Ed. ¶ 552.02 as follows:

> "Moreover, section 552(b) does not limit the estate's recovery to costs recoverable under section 506(c). *To the extent the estate invests free assets to enhance the value of the collateral,* the court may award the estate part of all of the proceeds based on the equities of the case. By invalidating after-acquired property clauses, section 552 adopts prior case law. The flexible approach taken by section 552(b) permits the court to preserve

---

1. At the hearing on the petition it was stipulated that the market price on the date of the "sealing" was $2.30 per bushel, resulting in a "sealing profit" of 29 cents per bushel. In the government's brief which they subsequently filed several months later, the government contends the market rate was $2.39. Inasmuch as the parties stipulated at the time of the hearing that there were no contested questions of fact, and that the facts as set forth in the petition were true, the court is basing its decision on the market price of $2.30 per bushel and "sealing profit" of 29 cents per bushel.

valid security interests in proceeds, rents and the like, but at the same time, requires the court to protect the interests of unsecured creditors. If a creditor's collateral is processed and sold or proceeds are otherwise collected, either the creditor or the trustee, debtor, or debtor in possession may request a noticed hearing to have the court determine whether the creditor's interest in proceeds should be limited based on the equities of the case. If the estate has invested labor or capital *free of the creditor's security to enhance the value of the collateral*, section 506(c) permits the estate to recoup its costs. Profit may be given to the estate or apportioned between the estate and the secured party." (Our emphasis added.)

The Debtors also quote from *Cowans, Bankruptcy Law and Practice*, 1986 Ed., § 10.13 as follows:

"The second exception is one that allows the court to order otherwise after notice and hearing based upon the equities of the case. The legislative history explains the thinking in this connection. It advises that the general rule makes the proceeds available '... except to the extent that where the estate acquires the proceeds at the expense of other creditors holding unsecured claims, the expenditure resulted in an improvement in the position of the secured party.'

*The exception covers the situation where raw materials, for example, are converted into inventory, or inventory into accounts, at some expense to the estate, thus depleting the fund available for general unsecured creditors, but is limited to the benefit inuring to the secured party thereby."* (Our emphasis added.)

Finally, the Debtors cite *J. Catton Farms, Inc. v. First National Bank of Chicago*, 779 F.2d 1242 (7th Cir.1985) quoting from the opinion as follows:

"*The equity exception is meant for the case where the trustee or debtor in possession uses other assets of the bankrupt estate (assets that would otherwise*

*go to the general creditors) to increase the value of the collateral.* See, e.g., *In re Village Properties, Ltd.,* 723 F.2d 441, 444 (5th Cir., 1984). Suppose a creditor had a security interest in raw materials worth $1 million, and the debtor invested $100,000 to turn those raw materials into a finished product which he then sold for $1.5 million. The proceeds of this sale (after deducting wages and other administrative expenses) would be added to the secured creditor's collateral unless the court decided that it would be inequitable to do so—as well it might be, since the general creditors were in effect responsible for much or all of the increase in the value of the proceeds over the original collateral." (Our emphasis added.)

Although the Debtors have accurately set forth the meaning given to the equity exception of Section 552(b), the facts of the case before this court do not bring it within the scope of the exception. The Debtors did not use other assets that would otherwise go to the general creditors in order to produce the "sealing profit". The "sealing profit" was produced because of a passive investment of Farmers' collateral, as compared to an active effort by the Debtors involving an expenditure or usage of Debtors' other assets which might otherwise be available for general creditors. All the Debtors did was to take the corn crop, which was the subject of the Farmers' security agreement, and place it in a government program which produced an increased profit of 29 cents per bushel.

The Debtors also asked the court to focus on the fact that the "sealing" contract was entered into post-petition, citing *In re Kruse*, 35 B.R. 958 (Bkrtcy.D.Kans.1983). In *Kruse* the security interest was granted on April 29, 1982, the bankruptcy proceeding was filed January 4, 1983, and on May 16, 1983, participation in the PIK program was approved. The court, in *Kruse*, first held that the creditor was entitled to the PIK payment received on an account of crops planted prior to the filing of the bankruptcy petition, and then held that the

creditor was not entitled to the PIK entitlement arising out of any agreement not to plant crops. The basis for that court's latter holding was twofold. First, the creditor's security agreement did not grant a security interest in general intangibles or contract rights, and second, even if the creditor did have a security interest in general intangibles, there were no general intangibles, in the form of PIK entitlements, in existence until after the debtors filed their bankruptcy petition. The facts of the case before this court bring it within the first part of the *Kruse* holding, in that the "sealing profit" is proceeds of Farmers' collateral which was in existence at the time the bankruptcy was filed.

The Debtors support their position by arguing that a holding contrary to their position would send a message to debtors not to "seal", but merely to abandon the grain to the secured creditor to realize what he can on the open market, and that rehabilitation prospects of the debtor would be negatively impacted and the affect on the other creditors is apparent. Such an emotional and speculative argument, without evidentiary support, is not persuasive. This court seriously doubts that a holding contrary to that requested by the debtors would have the dire consequences predicted by the debtors.

The Debtors' brief contains an extensive argument attacking the Farmers' right of set-off. Although at the time of the hearing Farmers made reference to a right of set-off, Farmers' brief stated that the sole purpose of referring to the right of set-off was to show that it was illogical to deny Farmers the "sealing profit" since it was another arm of the government that initially bestowed the subsidy. Inasmuch as Farmers is not relying on the right of set-off as provided by Section 553(a), this court does not deem it necessary to rule on that issue.

IT IS, THEREFORE, ORDERED that Farmers is entitled to receive the "sealing profit" of $8,700.00, and the Debtors are ordered to pay over to Farmers the remaining sum of $8,700.00 which they are holding.