In re HIPP, INC., Debtor.

Thomas J. GRIFFITH, Trustee for Hipp, Inc., Plaintiff,

v.

LAWRENCE SYSTEMS, INC. OF MASS., Defendant.

Thomas J. GRIFFITH, Trustee for Hipp, Inc., Plaintiff,

v.

OLES GRAIN CO., Lawrence Systems, Inc. of Mass., Defendant.

Thomas J. GRIFFITH, Trustee for Hipp, Inc., Plaintiff,

v.

Joe HIPP, Star Elevator, Inc., Oles Grain, and Lawrence Systems, Inc., Defendants.

Bankruptcy No. 284–20080.
Adv. Nos. 284–2024, 284–2025 and 284–2031.

United States Bankruptcy Court, N.D. Texas, Amarillo Division.

March 24, 1987.

644

Thomas J. Griffith, Lubbock, Tex., trustee-in-bankruptcy.

Floyd D. Holder, Jr., Lubbock, Tex., for trustee.

Linda Coffee, Palmer, Palmer & Coffee, Dallas, Tex., for Oles Grain.

Richard D. Ladd, Maguire, Vanderpool & Ladd, Pampa, Tex., for Lawrence and Phoenix.

William H. LaFont, LaFont, Tunnell, Formby, LaFont & Hamilton, Plainview, Tex., for Creditors Committee in Hipp, Inc.

Russell L. Munsch, Decker, Hardt, Kopf, Harr, Munsch & Dinan, Dallas, Tex., for Robert H. Tolar, Trustee-in-Bankruptcy for Oles Grain.

Philip R. Russ, Amarillo, Tex., for Joe Hipp.

## MEMORANDUM OF OPINION

JOHN C. AKARD, Bankruptcy Judge.

The matters before the Court involve a series of Adversary Proceedings filed in 1984 between Thomas J. Griffith (as Trustee-in-Bankruptcy for Hipp, Inc.), Oles Grain Company, Inc., the Trustee-in-Bankruptcy for Oles Grain Company, Inc. and Lawrence Systems of Mass., Inc. (Lawrence).

In conjunction with these matters, the Court also heard a Motion to be Relieved from the Automatic Stay filed by Phoenix Grain, Inc. (Phoenix) which alleged it is the holder of two notes originally executed by Hipp, Inc.

In Adversary No. 284–2031, Joe Hipp and Star Elevator, Inc. were original parties Defendant. During the course of the trial on this matter, a settlement was announced between Thomas J. Griffith, Trustee for Hipp, Inc., Joe Hipp and Star Elevator, Inc. which removed the latter as Defendants in No. 284–2031 and settled No. 284–2041.[1]

At the commencement of the hearing, the Trustee-in-Bankruptcy for Oles Grain Company filed a Motion for Continuance which was overruled. The Court also relieved the automatic stay in the Oles Grain Company case so that the Trustee could proceed as a party Defendant in these Adversary Proceedings.

### Statement of Facts

The Hipp family was active in the grain elevator business in the Panhandle of Texas for approximately 50 years. At all times material to these proceedings, Joe Hipp was the sole shareholder and principal officer of Hipp, Inc. (Hipp). Hipp's principal elevator was in Tulia, Texas with other

---

1. Joe Hipp was not available to testify because he is serving a term in the Federal penitentiary. Transcripts of his testimony at prior hearings at which the parties to this matter or their prede-

cessors were present and able to cross-examine him, were introduced; however, this testimony was seldom referred to during the trial.

elevators located at Claytonville, Nazareth, Vigo Park, and Kress, Texas. In 1985, the lienholder on the Claytonville elevator received relief from the automatic stay and foreclosed on that property.

Although Hipp owned and operated the elevators, the bonded warehouseman was Lawrence. Until 1982, Lawrence had an employee, Carl Tidwell, on the premises of Hipp. He was selected and his salary established by Hipp, but he was paid by Lawrence. Mr. Tidwell testified that in 1982 Lawrence changed its program so that he became an employee of Hipp, but was designated Lawrence's agent. Mr. Tidwell was a dual agent and had responsibilities both to Hipp and to Lawrence. He was authorized to buy and sell grain for Hipp and was authorized to sign checks on the Hipp account. As Lawrence's agent, Mr. Tidwell's duties were to open and close the elevator daily and to supervise the issuance of warehouse receipts issued by Lawrence as the bonded warehouseman. In this connection he also supervised the weighing, storage and removal of grains. The testimony showed that, as a practical matter, these procedures were not followed.

Gerald Carter, an employee of Lawrence, generally supervised numerous warehouses of various types in the Texas Panhandle. He testified that the company's established procedures were seldom followed in practice. Mr. Carter stated that normally he visited the elevators about four times a year to measure the grain on hand. Mr. Tidwell reported weekly to Mr. Carter's office in Amarillo on grains stored and warehouse receipts issued. It is quite obvious that Mr. Tidwell could not fully supervise elevator operations at five scattered locations.

In order to be a public warehouseman (and thus be able to issue negotiable warehouse receipts), Lawrence was required to comply with the United States Warehouse Act, 7 U.S.C. § 241 *et seq.* and the Texas Agriculture Code § 14.001 *et seq.* Follow-

ing a December, 1983 inspection by the United States Department of Agriculture (USDA), that agency withdrew Lawrence's authority to operate public grain storage warehouses due to grain shortages in the Hipp elevators.[2] Mr. Tidwell stated that the customers of the Hipp elevators were not advised of the USDA's action and that signs indicating that the elevators were being operated by Lawrence remained in place. Apparently it was "business as usual" and Lawrence was not called upon to issue negotiable warehouse receipts because the USDA's action took place in December rather than during harvest.

The December, 1983 inspection and measurement conducted by the USDA revealed substantial shortages in the quantity of grain stored in the Hipp elevators. Additionally, much of the grain stored was below the quality represented by the warehouse receipts. Mr. Carter testified that he "requested" Mr. Hipp to make up the deficiencies. Each report prepared by Lawrence contained a column for "Company-Owned Grain." That grain was not owned by Lawrence (although the report would indicate that it was) but by Hipp.

Methods which could be used to cure the grain shortages included:

a. Additional grain purchased by Hipp could be placed in the elevator without reflecting any increase in the storage. Apparently this was done in some instances, but not many.

b. Additional grain purchased by Hipp could be placed in the elevator, and shown as "Company-Owned Grain." This would reduce the shortage because "Company-Owned Grain" was considered available to fulfill the warehouse receipt requirements.

c. Hipp could purchase grain from a farmer who had it stored in the elevator. This grain would then be shifted from the "Grain Owed to Third Parties" column, to the "Company-Owned Grain" column.

2. Mr. Carter's testimony indicated that the Hipp warehouses were the only grain warehouses being operated by Lawrence at that time near Amarillo, Texas. Lawrence operates other types of public warehouses which were not affected by the order.

Lawrence had to put up a bond in order to become a public warehouse. Any losses by the bonding company were charged to Lawrence. Lawrence, in turn, had an agreement with Hipp whereby Hipp would be responsible for any grain storage losses. The obligations of Hipp to Lawrence were personally guaranteed by Joe Hipp.

Mr. Carter testified that from time to time Lawrence had noted shortages in the Hipp elevators. In May, 1983 a measurement by Lawrence of the Hipp elevators showed shortages. Shortages were also shown after a measurement made in June, 1983 by the Commodity Credit Corporation. As a result of these shortages, on June 22, 1983 Lawrence got Hipp to execute a Deed of Trust on all of the elevators to secure Hipp's performance under its contracts with Lawrence.

The testimony showed that during the months of January, February, and March, 1984, Hipp conducted an active program to cover these losses. Additional losses were discovered in February, 1984 when it was revealed that 11 million bushels of wheat which Hipp had alleged was stored in another company's warehouse, were found to be missing. Several farmers and elevator operators testified that they sold grain to Hipp during this period for which they never received payment. In some instances, the grain delivered to Hipp was to be paid for later; in others, warehouse receipts were surrendered but the farmers were never paid; and in still others, Hipp checks were returned for insufficient funds. One warehouseman testified that in the Fall of 1983 and early 1984 he paid Hipp more than $988,000.00 in prepayments for grain to be delivered. Neither the grain nor the warehouse receipts representing the grain were ever delivered to him by Hipp.

At the First National Bank of Tulia, Hipp overdrafts approximated $1,600,000.00.

This was the result of the Bank giving immediate credit on various Hipp deposits which were later dishonored.

Hipp filed its petition in bankruptcy on April 11, 1984, but that gets ahead of our story. One can easily imagine the anxious concern of Lawrence and the pressure it brought to bear on Mr. Hipp during the months just prior to the bankruptcy filing. The testimony indicated that in March, 1984, there were three employees of Lawrence on the Hipp premises at one time. On March 30, 1984, a flurry of negotiations and transactions concluded with the execution of a number of documents. These included:

a. A lease of the elevators in Tulia, Nazareth, Vigo Park, and Kress (the four elevators) to Oles Grain Company (Oles Grain).

b. A lease of the Claytonville elevator from Star Elevator, Inc. to Oles Grain.[3] The lease provided for payments of $10,000.00 quarterly from Oles Grain to Star Elevator, Inc.

c. A cancellation agreement between Hipp and Lawrence which provided in great detail for measurement of the grain in the elevators, both as to quantity and quality, and for repayment of any shortages by Hipp to Lawrence.

d. A note from Hipp payable to Lawrence in the sum of "$1,860,000.00 or such lesser amount as is advanced under the Settlement Agreement" (Lawrence Note). The note was payable on demand and if no demand, on November 1, 1984.

e. Subleases of the warehouses from Oles Grain to Lawrence so that Lawrence could remain as the warehouseman and Oles Grain could operate the warehouses.

**3.** Hipp had originally leased the Claytonville elevator in 1981. In 1983, Hipp paid $100,000.00 to Bobby Flick, the lessor, as down payment on the purchase of the Claytonville elevator. Title, however, was taken in the name of Star Elevator, Inc., which was wholly owned by Joe Hipp. As part of the settlement between Thomas J. Griffith, Trustee and Joe Hipp, Joe Hipp agreed that Star Elevator, Inc. was a sham, and that the Claytonville Elevator should be considered as an asset of Hipp. As previously noted, Mr. Flick foreclosed on that elevator in 1985.

f. An assignment of the Lawrence Note from Lawrence to Oles Grain.

g. An unsecured note from Oles Grain and David Oles, individually, to Lawrence in the principal amount of $900,000.00. The note provides for no interest and no payments until 1991, when $175,000.00 is due. Two other installments of $175,000.00 each are due in 1992, 1993 with the balance due April, 1994. David Oles testified that this note was given in consideration for the Lawrence Note. Since both Oles Grain and David Oles, individually, have filed for bankruptcy, this note would have no value at this time.

John Hancock Mutual Life Insurance Company (Hancock) held a lien on the four grain elevators under a note dated October 1, 1973 (Hancock Note). The lease on the four elevators provided for the payment of the Hancock Note from the rentals. In May, 1984 Oles Grain purchased the Hancock Note.

Mr. Carter's testimony was devoid of any information as to amounts due to Lawrence on the June, 1983 Deed of Trust, or the March 30, 1984 Lawrence Note. He indicated that "claims" were made against Lawrence's bonding company for $1.7 million. To the best of his knowledge, however, neither the bonding company nor Lawrence paid any of the obligations.

David Oles testified that in 1983 Oles Grain made a substantial profit and was ready to expand. The business did not do as well in 1984. In September, 1984, the Texas Department of Agriculture cancelled Lawrence's public warehouseman's bond and ordered that all of the warehouses be emptied. Oles Grain was unable to secure bonding to become a public warehouseman on its own, the business deteriorated rapidly, and an Involuntary Petition in Bankruptcy was filed against Oles Grain on June 4, 1985. An Order for Relief was entered on June 26, 1985.

Faced with the impending doom of Oles Grain, David Oles orchestrated a number of transactions designed to remove the Lawrence Note and the Hancock Note from Oles Grain and put them into the hands of his father, Dr. C.P. Oles.

In December, 1984, David Oles formed a corporation known as Top-O-Texas Trucking Company, Inc. (TOT). Mr. Oles stated that although he was the incorporator of the corporation, he was not active in it until August, 1985. In the meantime, the corporation was owned by friends of his who, in August of 1985, sold it to Carl Tidwell. Mr. Tidwell did not have the $5,000.00 purchase price, but stated that he acquired the funds from "personal sources." [4] Mr. Tidwell was previously employed by Hipp for a number of years. When Oles Grain took over the Hipp elevator operation, Mr. Tidwell went to work for Oles Grain where he stayed until the Oles Grain bankruptcy. Mr. Oles stated that he "went to work" for Mr. Tidwell in August, 1985 as President of TOT. He remained in that position until December, 1985, when he became the General Manager. He remained in that position until his July, 1986 resignation.

By Transfer dated April 8, 1985 and recorded May 23, 1985, Oles Grain, acting through David Oles as its President, assigned the Lawrence Note to David Oles individually. By Collateral Transfer of Note also dated April 8, 1985 and recorded on May 23, 1985, David Oles assigned the Lawrence Note to Oles Grain Company as security for a note executed by David Oles payable to Oles Grain Company. The note from David Oles to Oles Grain Company is not described in the Collateral Transfer of Note. The abstracts admitted into evidence do not reveal that the Collateral Transfer of Note was ever released.

By Transfer of Lien dated May 4, 1985 and recorded on May 23, 1985, David Oles transferred the Lawrence Note to TOT. David Oles testified that the consideration for this transfer was TOT's unsecured note to David Oles in the amount of $350,000.00

---

4. In December, 1983, he received a "bonus" of $40,000.00 from Joe Hipp. Mr. Tidwell testified that, except for the $40,000.00 given him by Joe Hipp, his bank account never exceeded $10,000.00.

payable in 1992. By Collateral Transfer of Note dated May 4, 1985, TOT, acting through Alvin Thompson as President, assigned the Lawrence Note to David Oles as security for a note of $350,000.00 of even date therewith. The Collateral Transfer was recorded on May 23, 1985.

Phoenix was set up in August, 1986. Jim Archer, the President of Phoenix, stated that the shareholders and the consideration they gave for their shares are as follows:

   a. Dr. C.P. Oles—85,000 shares received for assignment of the Hancock Note to the corporation.

   b. Marvin Lane—10,000 shares received for assignment of the Hancock Note to Dr. Oles.

   c. Carl Tidwell—5,000 shares received for some type of warehouse receipts.

Mr. Archer testified that the corporation had $5,000.00 in the bank provided by Dr. Oles. The assets of the corporation consisted of the Lawrence Note and the Hancock Note. Mr. Archer stated that Phoenix acquired the Lawrence Note in exchange for 20,000 shares of non-voting preferred stock issued to TOT.[5] Mr. Archer testified that the corporation had no debts. When asked about the $5,000.00 advanced by Dr. Oles, he said he "guessed they owed it to Dr. Oles." Mr. Archer stated that the company was formed for the purpose of going in the grain elevator business. He acknowledged that he was a real estate agent and had no experience in operating grain elevators. He stated that David Oles had approached him about working for this new corporation which was being formed by Dr. Oles.[6]

In testifying about matters involving the Oles Grain bankruptcy and the transactions of Phoenix in that bankruptcy proceeding, Mr. Archer suggested that David Oles would be the person to ask about the transactions. This further indicated that David Oles is orchestrating these matters and is the principal behind the transactions.

■ It is obvious to the Court that from the outset all parties concerned considered the Lawrence Note worthless. It strains the credibility of the Court to believe that Lawrence would discount a valid obligation due in six months for a note for half that amount payable years later. The weight of the evidence leads the Court to believe that the parties knew when the note was signed that Hipp intended to file bankruptcy. (Hipp filed bankruptcy approximately ten days after the signing of the note.) Thus, this transaction was used merely to manufacture a claim in the bankruptcy proceeding. The note is not negotiable and, thus, every holder is subject to all of the defenses of the note. In addition, the attempted transfers of the note by David Oles were shams. This is borne out by the fact that the note was never physically transferred to TOT, but remained in the hands of Oles Grain, or its attorneys, until it was turned over to Oles Grain's Trustee-in-Bankruptcy.

Although the documents executed by Hipp and Lawrence recited grain shortages, there was no consideration for the Lawrence Note. Mr. Carter testified that neither Lawrence nor its bonding company paid any claims for grain shortages.

For all of the reasons given, the Court finds that the Lawrence Note and the liens purportedly created to secure it were void *ab initio*.

### The Hancock Note

Phoenix asserts that it is a holder in due course of the Hancock Note and, thus, takes the note free of defenses asserted by the Trustee pursuant to TEX.BUS. & COM. CODE ANN. § 3.305 (Vernon 1968).[7]

---

**5.** The copy of the note introduced into evidence did not show any endorsements and the abstract of title introduced into evidence did not show any recorded transfer to Phoenix.

**6.** Even the name Phoenix suggests that this business is "rising from the ashes" of Oles Grain Company.

**7.** The Texas Business & Commerce Code is the Texas adaptation of the Uniform Commercial Code. It is referred to hereinafter as TBCC.

In order for a holder to be a holder in due course, the instrument must be a negotiable instrument.[8] Our first inquiry then must be whether the Hancock Note is a negotiable instrument.

On October 1, 1973, Hipp, Inc. executed a promissory note (the Hancock Note) payable to Hancock. Relevant provisions of the note are:

a. The note is in the "principal sum of TWO MILLION AND NO/100 ($2,000,000.00) DOLLARS, or so much thereof as may be advanced to the undersigned, with interest to be computed from October 29, 1973 at the rate of 9.0 percentum per annum ..." The principal is payable in installments of $25,000.00 on March 1, 1974 and September 1, 1974 and $50,000.00 semiannually on the first days of March and September of each year until March 1, 1989 when the entire principal balance becomes due. Interest is payable quarterly.

b. The provisions concerning prepayment contain one schedule of prepayment rights and a separate schedule of prepayment rights "if the second disbursement of $1,200,000.00 is not disbursed."

c. The second page of the note just above the signatures contains the following language: "This note is given for an actual loan of TWO MILLION AND NO/100 ($2,000,000.00) DOLLARS."

Phoenix introduced into evidence an "Agreement Adjusting Loan Terms" dated September 29, 1977 between Hipp, various members of the Hipp family and Hancock. The Agreement recites that the remaining principal balance on the note is $1,296,500.00 and that a payment of $500,000.00 is being made on the principal of the note. Certain adjustments in the semiannual payments and the final payment are agreed to. Additional payments on the note are to be made if the net income of Hipp exceeds a certain level and they are to be deferred if the net income of Hipp falls below another level.

In order to be negotiable, an instrument must meet the requirements of TBCC § 3.104(a).[9] The note is signed by the maker and is payable to the order of Hancock.

■ We must first inquire whether the note calls for the payment of "a sum certain in money." The Trustee argues that the sum is not certain because the note is for $2,000,000.00 "or so much thereof as may be advanced." Phoenix argues that the last paragraph of the note stating that it is for a loan of $2,000,000.00 clarifies the matter. It is the opinion of the Court that when the three provisions of the note described above are taken together, one can only conclude that the note is not for a sum certain. Therefore, it is not a negotiable instrument.

As originally drafted, the Note was payable "at a definite time." Since Phoenix introduced the "Agreement Adjusting Loan Terms," Phoenix was apparently aware of that Agreement prior to the time it acquired the Hancock Note. The provisions calling for adjustments in the payments based on the net income of Hipp certainly destroy the definite time and make the note non-negotiable.

■ Assuming *arguendo* that the Note is negotiable, the next question is whether Phoenix is a holder in due course under TBCC § 3.302(a): [10]

---

8. TBCC § 3.302 (Vernon 1968). As used in the TBCC, the term "instrument" means a negotiable instrument. TBCC § 3.102(a)(5) (Vernon 1968).

9. (a) Any writing to be a negotiable instrument within this chapter must
    (1) be signed by the maker or drawer; and
    (2) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this chapter; and
    (3) be payable on demand or at a definite time; and
    (4) be payable to order or to bearer.
   TBCC § 3.104(a).

10. (a) A holder in due course is a holder who takes the instrument
    (1) for value; and
    (2) in good faith; and

a. The testimony indicated that Dr. C.P. Oles received 85,000 shares of the common stock of Phoenix for the assignment of the Hancock Note to the corporation. The stock would have little, if any, monetary value but it might have some intrinsic value, so it must be assumed that Phoenix paid value for the note.

b. The Court concludes that Phoenix did not take the Hancock Note in good faith. The events described above clearly show that David Oles and his father, Dr. C.P. Oles, orchestrated a series of transactions designed to remove the Hancock Note from Oles Grain for their personal benefit. The Court concludes that TOT and Phoenix are shams erected by David Oles and Dr. C.P. Oles for their personal benefit. Phoenix, being controlled by Dr. Oles and by David Oles, was certainly on notice of all defects to the Hancock Note and of all prior transactions relating to it.

c. The lease between Hipp and Oles Grain acknowledged that the Hancock Note was in default and there is no testimony that the payments were ever brought current. Phoenix certainly had notice that the note was overdue.

For the foregoing reasons, Phoenix cannot be classified as a holder in due course. As a practical matter, Phoenix did not prove that it holds the Hancock Note.[11]

■ The next question is whether the Hancock Note has been paid. The Lease Agreement of March 30, 1984, wherein Hipp leased to Oles Grain the four elevators, was for a term of eight years with an option to renew for an additional five years. It contained some conditions subsequent which would allow Oles Grain to terminate the lease. Those conditions subsequent all were to occur within 90 days of the date of the lease and there is no evidence that Oles Grain exercised any of those conditions subsequent.

The annual rental under the lease is $160,000.00 payable in quarterly installments of $40,000.00 each. The rent was to be paid to the Trust Department of the Amarillo National Bank as Escrow Agent and by that Escrow Agent distributed first to pay the current payments on the Hancock Note and then to the delinquent payments on the Hancock Note. The lease estimated that it would take two years to catch up the payments on the Hancock Note; thereafter the balance was to be paid to the holder of the second mortgage on the property. David Oles testified that the parties never utilized the escrow arrangement. The first payment of $40,000.00 was sent on March 30, 1984 directly to Hancock.

For reasons not explained by the testimony, on May 3, 1984 Oles Grain purchased

---

(3) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person. TBCC § 3.302(a).

11. A copy of the Hancock Note purporting to be endorsed to Phoenix by Dr. Oles was exhibited at the hearing, but never introduced into evidence. The president of Phoenix testified that he did not know the location of the original note. Following a recess, he returned to the stand to give a third-hand statement as to the location of the note. Such statements were clearly inadmissible and were not relied upon by the Court.

The abstract of title introduced by the Trustee contains a chain of assignments to Phoenix as follows:
a. Transfer from Hancock to Oles Grain dated May 23, 1984, recorded on June 20, 1984.
b. Notice of Appointment of Trustee in the Oles Grain bankruptcy case dated July 10, 1985, recorded September 9, 1985.
c. Transfer of Lien (relating to the Hancock Note) dated May 4, 1985, recorded January 10, 1986 from Oles Grain by David Oles, President, to TOT. David Oles testified that he did not back-date any of the documents, but the Court does not find that testimony credible. Even if the date is correct, the transfer was not perfected until after the bankruptcy of Oles Grain and therefore could be set aside by the Trustee-in-Bankruptcy of Oles Grain.
d. Transfer from TOT by Carl L. Tidwell, President, to Marvin J. Lane dated December 8, 1985, recorded February 14, 1986.
e. Transfer dated July 31, 1986, recorded August 25, 1986 from Marvin J. Lane to Dr. C.P. Oles.
f. Transfer dated July 31, 1986 from Dr. C.P. Oles to Phoenix, recorded August 25, 1986.

the Hancock Note from Hancock for $580,-118.91. Oles Grain cannot be a holder in due course of the Hancock Note because by signing the lease on March 30, 1984, Oles Grain acknowledged that the Hancock Note was seriously in default and that it would take approximately two years to bring it to a current status.

David Oles testified that the principal balance of the Hancock Note on May 3, 1984 was $570,296.87 and that accrued interest was $9,117.61, totaling slightly less than the $580,118.91 which Oles Grain paid to Hancock for the note. The difference may be represented by expenses of Hancock.

David Oles presented a schedule in which he applied what he referred to as "payment of lease payment by Oles Grain to Hipp, Inc. account" on July 1, 1984 and October 1, 1984 to arrive at a balance which he claimed to still be due under the Hancock Note. This is not a correct application of the law, is totally self-serving, and was not relied upon by the Court.

Under the lease of March 30, 1984, Oles Grain was obligated to pay the Hancock Note. In fact, Oles Grain made one payment directly to Hancock prior to acquiring the Note. Under the terms of the lease, the Hancock Note would have been fully paid before the expiration of the primary term of the lease. Thus, Oles Grain assumed the full obligation for paying the Hancock Note at the time it executed the lease.

TBCC § 3.601(b) provides: "Any party is also discharged from his liability on an instrument to another party by any other act or agreement with such party which would discharge his simple contract for the payment of money." Clearly, the obligation of Oles Grain to pay the note under the lease and the acquisition of the note by Oles Grain discharged Hipp from any liability on the note. Further, TBCC § 3.601(c) provides that the liability of all parties is discharged when a party who has himself no right of action or recourse on the instrument reacquires the instrument in his own right. Although technically Oles Grain did not reacquire the instrument, the acquiring of the instrument by Oles Grain has the same effect.

This rule was clearly stated by the Amarillo Court of Civil Appeals: "A party personally liable for the debt, who pays the same, is not subrogated to the rights of the mortgagee. 'Even if he should receive a formal assignment, the mortgage could not thus be kept alive but would be wholly merged and ended.'" (Citations omitted). *Smith v. Cooley,* 164 S.W. 1050, 1053 (Tex. Civ.App.—Amarillo 1914, writ ref'd).

In a case involving strikingly similar facts, the Nebraska Supreme Court held that a tenant who purchased a lien on the property is presumed to have purchased it to protect his possession and required the landlord to account to the tenant for what he paid for that lien. *Thrall v. Omaha Hotel Co.,* 5 Neb. 295 (1877); *see also Knoohuizen v. Nicholl,* 257 S.W. 972 (Tex. Civ.App.—Amarillo 1924, no writ) (holding that commissions earned by an insurance agent should be offset against a note owed by him); and *Marshall v. Porter,* 83 W.Va. 246, 98 S.E. 207 (1919), (holding that real estate notes were considered paid when they were acquired by a party obligated to pay them).

Payment is considered made at the time the note is acquired rather than in increments as the rental payments come due. *Coppard v. Martin,* 15 F.2d 743 (5th Cir. 1926), *cert. denied,* 273 U.S. 753, 47 S.Ct. 456, 71 L.Ed. 874 (1926); *see also, Dailey v. Aspen Democrat Pub. Co.,* 46 Colo. 145, 103 P. 303 (1909) (holding that a lessee of equipment is deemed to have paid rent when he acquired the mortgage on the equipment).

This situation is the equivalent of the fee owner acquiring the deed of trust note which results in the merger of the lien and the title. *Hall v. Conine,* 230 S.W. 823 (Tex.Civ.App.—Texarkana 1921, no writ). In *Hall,* the Texarkana Court of Civil Appeals held that the purchase of vendor's lien notes by trustees for the debtor cancelled the notes, stating:

When Harper ... assumed the payment of those notes, he became ... the principal obligor.... Neither Harper nor any-

one acting for him could by any form of contract with the holders of those notes acquire them as an assignee. Their purchase by him or anyone for his benefit would be treated as a payment of the debt, and the lien theretofore existing would be merged in the title. (Citations omitted.)

*Id.* at 824.

This Court concludes that the Hancock Note was paid at the time it was acquired by Oles Grain and the liens securing the Hancock Note were extinguished. For this reason, Phoenix has no interest in the Hancock Note, and the Motion to be Relieved from the Automatic Stay filed by Phoenix will be denied.

Order accordingly.[12]

---

**12.** This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052.