**In re Dannell Joe GEORGE, Bernita Mae George, Debtors.**

**In re Clarence LeRoy BRADFORD, Barbara Joyce Bradford, Debtors.**

**In re Laveta Bernice SHOFFNER, Debtor.**

**SECURITY BANK & TRUST CO. OF BLACKWELL, OKLAHOMA, Plaintiff,**

**v.**

**D. Michael CASE, Trustee, Defendant.**

**In re Joseph Carl FEIST, Anna Madgelan Feist, Debtors.**

**Bankruptcy Nos. 86–11593, 86–12527, 87–10943 and 86–12724. Adv. No. 87–0194.**

United States Bankruptcy Court, D. Kansas.

March 10, 1988.

---

Lynn D. Allison, Wichita, Kan., Trustee in In re George.

Eric D. Bruce, Bruce & Davis, Wichita, Kan., for Santa Fe Trail Credit Union and First State Bank and Trust Co. of Larned.

Anne L. Baker, John D. Ensley, Charles N. Henson, Eidson, Lewis, Porter & Haynes, Topeka, Kan., for the Kansas Bankers Ass'n.

Martin R. Ufford, Redmond, Redmond, & Nazar, Wichita, Kan., for Trustee in In re Bradford.

D. Michael Case, Minter, Case & Sublett, Wichita, Kan., Trustee in In re Shoffner.

William B. Sorenson, Jr., Morris, Laing, Evans, Brock & Kennedy, Chartered, Wichita, Kan., for Sec. Bank & Trust Co. of Blackwell, Okl.

Christopher J. Redmond, Redmond, Redmond, & Nazar, Wichita, Kan., trustee in In re Feist.

James D. Holt, Bruce & Davis, Wichita, Kan., for John and Mable Bauer d/b/a John Bauer Estate.

## MEMORANDUM OF DECISION

JOHN K. PEARSON, Bankruptcy Judge.

These cases are before the court for ruling on the trustees' challenges to various creditors' claims to Payment in Kind (PIK) Certificates in the trustees' possession. The facts are stipulated and are summarized below. The parties have exhaustively briefed the issues and the matters are ready for ruling. This is strictly a legal issue, as the trustees' challenge the validity of the creditors' security interests on the theory that no such state law interest can attach under the applicable C.C.C. regulations and other grounds.

### APPEARANCES

*In re George:*

Trustee, Lynn D. Allison, Wichita, appeared personally. Santa Fe Trail Credit Union appeared by Eric D. Bruce of Bruce

& Davis, Wichita. The amicus curiae, the Kansas Bankers Association, appeared by Charles N. Henson, Anne L. Baker and John D. Ensley of Eidson, Lewis, Porter & Haynes of Topeka.

### In re Bradford

Trustee, Edward J. Nazar, appeared by Martin R. Ufford of Redmond, Redmond, & Nazar, Wichita. First State Bank and Trust Company of Larned, Kansas appeared by Eric D. Bruce of Bruce & Davis, Wichita. The amicus curiae, the Kansas Bankers Association, appeared by Charles N. Henson, Anne L. Baker and John D. Ensley of Eidson, Lewis, Porter & Haynes of Topeka.

### In re Shoffner

Trustee, D. Michael Case, Wichita, appeared personally. Security Bank & Trust Co. of Blackwell, Oklahoma, appeared by William B. Sorenson, Jr. of Morris, Laing, Evans, Brock & Kennedy, Chartered, Wichita.

### In re Feist

Trustee, Christopher J. Redmond, Wichita, appeared personally. John and Mable Bauer, d/b/a John Bauer Estate, appeared by James D. Holt of Bruce & Davis, Wichita.

### FACTS

#### In re George

The Santa Fe Credit Union (Santa Fe) furnished operating funds under an open end credit plan to the debtors to finance their farming operation. In January 1980, Dannell Joe and Bernita Mae George (debtors), signed a security agreement giving Santa Fe a security interest in all crops planted or to be planted in consideration for the funds advanced under the open end credit plan. On April 14, 1986 debtors signed a new security agreement and a financing statement giving Santa Fe a security interest in a "growing wheat crop" on specifically described real property and "all debtors' rights in any A.S.C.S. or other state or federal government payments per-

taining" to the wheat crop. Santa Fe's financing statements covering the government payments were filed April 21, 1986 with the Kansas Secretary of State. Dannell Joe George was issued three generic PIK certificates. The first was issued May 22, 1986 and the last two were issued June 12, 1986. The PIK certificates were issued for debtors' participation in the PIK acreage reduction and land diversion program. After receiving the three PIK certificates, the debtors filed their Chapter 7 petition on October 20, 1986. After filing, the debtors delivered the three generic PIK certificates to Lynn D. Allison, (trustee). The trustee sold the certificates for $2,075.39, and has deposited the proceeds in the bankruptcy estate's account.

#### In re Bradford

The debtors, Clarence Leroy Bradford and Barbara Joyce Bradford, filed a petition under Chapter 7 on October 1, 1986. In 1985 and 1986 the First State Bank and Trust Company of Larned, Kansas (First State) made several farm loans to the debtors. The debtors signed security agreements with First State giving it a security interest in "all annual and perennial crops growing or hereafter planted, grown or harvested," "proceeds," and "all government payments of any kind." The PIK certificates were pledged as collateral for money lent to debtors to finance their farming operation in 1985 and 1986. First State's UCC–1 financing statements described the PIK collateral as "all government payments of any kind."

As of September 18, 1987, Edward J. Nazar, the trustee, has received all of the PIK certificates thus far issued to the debtors. The PIK certificates were issued post-petition in December 1986, January 1987, March 1987, and April 1987. All of the PIK certificates were issued to the trustee and the debtors jointly for debtors' participation in ASCS wheat deficiency programs. Other PIK certificates are due. The trustee sold the certificates for an aggregate of $7,876.60, and deposited the proceeds in the bankruptcy estate's checking account.

## In re Shoffner

The debtor, Leveta Shoffner, filed her Chapter 7 petition April 6, 1987. Among the security claimed by the Security Bank and Trust Company of Blackwell, Oklahoma (Security Bank), is all proceeds from government payments for 1986–87. Prior to her filing of this petition, debtor signed up for participation in the 1987 wheat deficiency program. Half of these payments for the 1987 and 1988 crops were made in generic PIK certificates. On September 10, 1986, Security Bank filed a U.C.C. financing statement with the County Clerk of Grant County, Oklahoma, granting Bank a security interest in 1986–1987 growing crops or crops to be acquired on specifically described real property and "all proceeds or products" of those crops. Sometime in early March 1988 the debtor will be paid $64,325.35 in government payments. Fifty percent (50%) of the payments, $32,162.67, will be in the form of generic PIK certificates. The balance will be in the form of crop deficiency checks. The PIK certificates will be issued in lieu of debtor's participation in the 1987 ASCS wheat deficiency program. Security Bank claims an interest in $19,300.43 worth of the PIK certificates because of its perfected security interest in growing crops and proceeds.

## In re Feist

The debtors, Joseph and Anna Feist, filed a petition under Chapter 7 on October 20, 1986. The John Bauer Estate (the Bauer Estate), made several farm loans to the debtors. On August 14, 1985, the debtors signed a security agreement with the Bauer Estate giving it a security interest in, *inter alia,* all crops growing or to be planted on specifically described real estate. The security agreement also gives the Bauer Estate an interest in "any and all increases, additions, accessions, substitutions and proceeds thereto and therefor." On August 15, 1985, the Bauer Estate filed a financing statement with the Kansas Secretary of State. Besides crops growing and to be grown, the financing statement included "all contract rights and accounts now owned and hereafter acquired," and proceeds of the crops grown or to be grown

on the specifically described real estate. The debtors have been issued two generic PIK certificates since filing their petition. The first was issued in December 1986, the second in March 1987. The December 1986 PIK certificate was issued as payment under the 1986 wheat deficiency program. The March 1987 certificate was issued as payment for debtors' participation in the 1986 sorghum deficiency program. The debtors were also involved in the U.S. government's PIK acreage reduction programs. No PIK certificates have, as yet been issued for debtors' participation in the acreage reduction program. The December 1986 certificate was redeemed on January 14, 1987 and the March 1987 certificate was redeemed on April 22, 1987. The aggregate amount of the two certificates is $2,321.92. The trustee has possession of the proceeds.

## DISCUSSION

The trustees challenge the validity of the creditors' security interests on the ground that the applicable F.D.A./C.C.C. regulations preempt state law and prohibit the attachment of any security interest in PIK certificates. They further assert, should the Court find state law to be applicable, that a PIK certificate is negotiable and therefore possession is required to perfect a security interest in it.

## I. FEDERAL PREEMPTION

Over the last several years, Congress has adopted various programs under which eligible farmers receive a variety of price support and other payments from the government. Around the basic programs authorized by Congress, the Department of Agriculture (U.S.D.A.) has erected a veritable briar patch of regulations. The programs and regulations change from year to year. Generally the U.S.D.A. handles the various programs through the Commodity Credit Corporation, (C.C.C.) a quasi-governmental corporation established under 15 U.S.C. § 714, et seq. The C.C.C. promulgates regulations governing the administration of the programs.

Prior to 1986, the programs involved direct payment to the farmer by check. 7 C.F.R. 770.1(a)(1984). However, in the Food Security Act of 1985 Congress authorized the Secretary of Agriculture to use government owned commodities and "negotiable" certificates redeemable in a commodity owned by the C.C.C. for payments under the programs. 7 U.S.C. § 1445b–2(a)(2)(A)(ii) (Supp.1987). Under prior programs, the certificates became known as PIK certificates and the name has continued in use even though the certificates are now generic and do not entitle the holder to delivery of a specific commodity. They may still, however, be redeemed in a commodity. The C.C.C. promulgated regulations to implement the 1986 and 1987 PIK programs. While earlier PIK programs and cash deficiency payment programs permitted assignment of the farmer's right to the payment, the final regulations issued by the C.C.C. for 1986 and 1987 provide: "Commodity certificates shall not be subject to any lien, encumbrance, or other claim or security interest, except that of an agency of the U.S. Government arising specifically under Federal statute." 7 C.F.R. § 770.4(b)(2), published October 16, 1986. 51 Fed.Reg. 36921.

The rules originally proposed as 7 C.F.R. Part 770 did not contain the above language. 51 Fed.Reg. 8428, March 11, 1986. The original rule, as revised on June 16, 1986, added the above language. 51 Fed. Reg. 21834. Subsequent amendments to the proposed rules did not affect the language at issue here. The final rule with the above language was published in the Federal Register of October 16, 1986 with an effective date of October 15, 1986. 51 Fed.Reg. 36904.

The actual certificates issued to the debtors in these cases and sold by the trustees contained the following language:

This Certificate shall not be subject to any State law or regulation, including but not limited to State statutory and regulatory provisions with respect to commercial paper, security interests, and negotiable instruments. This certificate shall not be encumbered by any lien or other claim, except that of an agency of the United States Government.[1]

The issue presented is one of law: does the federal regulation "preempt" the state law of secured transactions, thus vitiating the creditors' claimed security interests?

It is a fundamental precept that to the extent a conflict exists between state and federal law, state law must yield. U.S. Const., Art. VI, cl. 2; *Maryland v. Louisiana,* 451 U.S. 725, 747, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981); *Johnson v. First National Bank of Montevideo, Minn.,* 719 F.2d 270 (8th Cir.1983), *cert. denied,* 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984). Laws enacted pursuant to the powers conferred by the Constitution on Congress are the supreme law of the land and will prevail over state law. *Testa v. Katt,* 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947). The states may not interfere with the United States government in the exercise of its constitutional powers (e.g., foreign affairs, regulations of aliens, war powers, armed forces) and all matters touching the rights and obligations of the United States. *Spector Motor Service v. O'Connor,* 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573 (1951), and U.S. Const., Art. VI, cl. 2. State action must give way to federal legislation where a valid act of Congress is in actual conflict with the law of the state. *Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963); *McDermott v. Wisconsin,* 228 U.S. 115, 132, 33 S.Ct. 431, 435, 57 L.Ed. 754 (1913).

State law may be preempted by an express statement, by federal occupation of the field, or by direct conflict with federal law. *Louisiana Public Service Commission v. Federal Communications Com-*

---

1. The very vagueness of the language brings to mind many questions. Does this mean, for example, that the FDIC, as successor to a failed bank which claimed to have an interest in a certificate, would be entitled to claim a lien on the certificate, even though the bank would not? Would the SBA or FmHA as guarantor of a farm loan made by a bank be entitled to a lien where the bank might not?

*mission,* 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986). In *Louisiana Public Service Commission,* the Supreme Court held that preemption occurs when any of these six conditions exist:

[1] when Congress, in enacting a federal statute, expresses a clear intent to preempt state law, [2] when there is outright or actual conflict between federal and state law, [3] where compliance with both federal and state law is in effect physically impossible, [4] where there is implicit in federal law a barrier to state regulation, [5] where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or [6] where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. (Citations omitted.)

*Id.* 106 S.Ct. at 1898.

The party asserting federal preemption has the affirmative burden of showing the inconsistency or at least the possibility of conflict between federal law or regulation and the state law purportedly preempted. *Morse v. Mutual Federal S & L Association of Whitman,* 536 F.Supp. 1271 (D.Mass.1982). The burden is on the proponent of federal preemption to put forth a strong case. *Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960); *Druker v. Sullivan,* 334 F.Supp. 861 (D.Mass.1971), *aff'd.,* 458 F.2d 1272 (1st Cir.1972).

While it is true that federal regulations may preempt state law, a federal agency's power to preempt state law through regulation is severely limited. A federal agency has no inherent authority to preempt state law. *Louisiana Public Service Commission v. F.C.C., supra; contra, In Matter of Lehl,* 79 B.R. 880 (Bankr.D.Neb. 1987). The federal courts have consistently held that a federal agency may preempt state law only where authorized by Congress. In examining the limits of federal agency preemption the court, in *Louisiana Public Service Commission,* stated:

[I]t is also true that a federal agency may preempt state law only when and if it is acting within the scope of its congressionally delegated authority. This is true for at least two reasons. First, an agency literally has no power to act, let alone preempt the validly enacted legislation of a sovereign state, unless and until Congress confers power upon it. Second, the best way of determining whether Congress intended the regulations of an administrative agency to displace state law is to examine the nature and scope of the authority granted by Congress to the agency.

. . . .

Thus, we simply cannot accept an argument that the FCC may nevertheless take action *which it thinks will best effectuate a federal policy.* An agency may not confer upon itself power. To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress. This we are both unwilling and unable to do. (Emphasis added.)

*Id.* 106 S.Ct. at 1901–1902.

Without the authorization of Congress, a federal agency may not preempt state law. The delegation of the preemption power to the federal agency must be clearly expressed. While there is authority for the proposition that the intent may be inferred from the purpose and circumstances of the legislation, in recent cases the Supreme Court has refused to either presume or infer intent. The Court requires that Congress "manifest its intention clearly." *New York State Dept. of Social Services v. Dublino,* 413 U.S. 405, 413, 93 S.Ct. 2507, 2513, 37 L.Ed.2d 688 (1973), quoting *Schwartz v. Texas,* 344 U.S. 199, 202–203, 73 S.Ct. 232, 235, 97 L.Ed. 231 (1952); *see also Guschke v. City of Oklahoma City,* 763 F.2d 379, 383 (10th Cir.1985); *Integrity Management Intern. v. Tombs & Sons, Inc.,* 614 F.Supp. 243, 245 (D.Kan.1985). A court should not find that state law is preempted unless the state law does major damage to clear and substantial federal interests; "mere conflict" in the words of the two statutes does not imply federal

preemption. *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 581, 99 S.Ct. 802, 808, 59 L.Ed.2d 1 (1979).

The determination of Congressional intent is a complicated and often mystic process. Even if the legislative intent that the federal law preempt state law is not express, the Congressional intent may be gleaned from the pervasiveness of the federal scheme, *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980),[2] the need for uniformity, *Jones v. Rath Packing Co.,* 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977), *reh. denied,* 431 U.S. 925, 97 S.Ct. 2201, 53 L.Ed.2d 240 (1977),[3] or the danger of conflict between the enforcement of state laws and the administration of federal programs, *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), *reh. denied,* 465 U.S. 1074, 104 S.Ct. 1430, 79 L.Ed.2d 754 (1984).[4] However, absent persuasive reasons manifesting Congressional intent of preemption, the court should not lightly presume the invalidity of state regulations. *Malone v. White Motor Corp.,* 435 U.S. 497, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978) (state statute relating to pensions not preempted by older federal law even though a new federal statute expressly provided for preemption).

■ It is clear that Congress did not give C.C.C. the express authority to preempt state law in either the Food Security Act or the enabling act creating the C.C.C.. In Title 7 of the Code of Federal Regulations the drafter cites as authority 15 U.S.C. § 714b for the draft regulation. 7 C.F.R. § 770.4 (1987). Section 714b empowers the Commodity Credit Corporation, *inter alia,* to:

> [E]nter into and carry out such contracts or agreements as are necessary in the conduct of its business. State and local regulatory laws or rules shall not be

applicable with contracts or agreements of the corporation or the parties thereto to the extent that such contracts or agreements provide that such laws or rules shall not be applicable or to the extent that such laws or rules are inconsistent with such contracts or agreements.

15 U.S.C. § 714b(g) (1976). As § 714b(g) does not expressly authorize preemption of state law on security interests or encumbrances, the general corporate authority is not sufficient to support the preemption of state law. Because a federal agency has no inherent authority to preempt state law, *Louisiana Public Service Commission v. F.C.C., supra,* Congressional intent to preempt must be clearly manifested.

The Food Security Act of 1985 does not expressly empower the U.S.D.A. or the C.C.C. to adopt regulations preempting state commercial law governing secured transactions. 7 U.S.C. § 1445b–2(a)(2)(A)(ii) (Supp.1987). Thus, the preemption authority allegedly delegated, if it exists at all, must be gleaned from the circumstances of the statute. Even the broadest reading of the Food Security Act and the basic statutes creating the C.C.C. will not support the conclusion that preemption may be presumed or inferred: neither the pervasiveness of the federal scheme, the need for protecting an overriding federal interest, nor the existence of conflict between the benefit program and state secured transaction laws exist. The farm programs are primarily a matter between the federal government and the individual farmer. The government merely has a secondary interest in the use that the farmer makes of the proceeds.

Were Congress so inclined, it could clearly manifest an intent to control the use of the proceeds from the benefit program. Indeed, in other situations it has expressly

---

**2.** State tax as applied to commerce by non-Indians on an Indian reservation preempted by pervasive federal regulations.

**3.** State may not enact food labeling requirements which do not permit reasonable weight variation in accuracy due to moisture loss during distribution when federal law allows such

variation to facilitate uniform value comparisons.

**4.** State law invalid under supremacy clause if state law stands as an obstacle to the accomplishment of the full purpose and objectives of Congress.

stated its intention of controlling the use of proceeds from other benefit programs. *See, e.g.,* 16 U.S.C. § 590h(g) (Supp.1987) (assignments of cash payments made under the Soil Conservation Act for preexisting debt are expressly prohibited). *See also* 7 C.F.R. § 709(3)(a) (1986). The commercial law of secured transactions is primarily a matter for private contract between the farmer and the farmer's creditors. *In re Sunberg,* 729 F.2d 561 (8th Cir.1984). The Uniform Commercial Code is recognized as a source of federal common law. *United States v. Kimbell Foods,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979); *In re Kruse,* 35 B.R. 958 (Bankr.D.Kan.1983).[6] Unless federal law provides for a different procedure, state law is controlling in commercial transactions. *See In re Gelking,* 754 F.2d 778 (8th Cir.1985), *cert. denied,* 473 U.S. 906, 105 S.Ct. 3529, 87 L.Ed.2d 653 (1985). Congress did not address the question of security interests in PIK certificates in the 1985 legislation, thus there is no conflict on the face of the statutes.

Even assuming there is a clear statutory conflict, where two statutes clash, they are construed in such a fashion as to avoid preemption. *Allen v. Grand Central Aircraft Co.,* 347 U.S. 535, 74 S.Ct. 745, 98 L.Ed. 933 (1954); *Sanford's Estate v. Commissioner of Internal Revenue,* 308 U.S. 39, 60 S.Ct. 51, 84 L.Ed. 20 (1939); *Washington Post v. Washington Baltimore Newspaper Guild, Local 35,* 787 F.2d 604 (D.C.Cir.1986); *Forman v. United States,* 767 F.2d 875 (C.A.Fed.1985); *Northern Natural Gas Co. v. Grounds,* 441 F.2d 704 (10th Cir.1971); *Layne Western Co. v. Buchanan County,* 85 F.2d 343 (8th Cir.1936); *United States v. Shell Oil Co.,* 605 F.Supp.

1064 (D.Colo.1985); *Miller v. United States,* 615 F.Supp. 160 (E.D.Ky.1985). Also, even where preemption is express, it is limited to the specific facts of the particular situation. *Cf.* Clark, *The Law of Secured Transactions Under the Commercial Code,* ¶ 1.8[1] (1980).

 Unfortunately it is impossible to construe the broad regulation and the equally pervasive state statutory scheme in such a fashion as to avoid preemption. Thus, the Court may either invalidate the regulation as it is applied to these transactions or hold inapplicable a broad body of state commercial law upon which creditors and debtors have relied for many years to govern their dealings. In the absence of a clear Congressional mandate to preempt state law, this Court "declines to tread upon the intricate state law upon which private parties base their every day commercial transactions ..." *United States v. Kimbell Foods, supra* at 440 U.S. 729, 99 S.Ct. 1459, 59 L.Ed.2d 725.

That conclusion is bolstered by prior case law under the earlier PIK regulations. While there are obvious differences in the wording of the statutes and regulations between the 1983 and 1986 PIK programs, the courts have generally held that the anti-assignment language in the prior regulation was for administrative ease and not intended to bar the farmer from pledging the entitlement as collateral for prior or new debt. *In re Sunberg,* 729 F.2d 561 (8th Cir.1984); *In re Sabelka,* 57 B.R. 972 (Bankr.N.D.Iowa 1986); *In re Kruse,* 35 B.R. 958 (Bankr.D.Kan.1983); *In re Nivens,* 22 B.R. 287 (Bankr.N.D.Tex.1982).

---

**6.** In *Kimbell Foods,* the Supreme Court, following *Clearfield Trust v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), held that federal law controls in areas governing federal agencies, but concluded that "nondiscriminatory state law" was the most suitable source of rules for courts dealing with the rights and duties of federal agency lenders. Controversies affecting the operation of federal programs do not inescapably require the enforcement of uniform federal rules. Whether to adopt state law or to fashion a nationwide uniform federal rule is a matter of judicial policy dependent upon the nature of the governmental interests involved and the effects of the application of state law upon that federal interest. *United States v. Kimbell Foods, supra* at 440 U.S. 727–728, 99 S.Ct. at 1457–1458. Therefore, absent a clear Congressional directive to the contrary, the source of the federal law of secured transactions will be Article 9 of the U.C.C. *Kimbell Foods, Inc., id.* Kansas law permits a security interest in PIK certificates. *In re Kruse,* 35 B.R. 958 (Bankr.D.Kan.1983). Thus, the federal common law of this jurisdiction allows the taking and perfecting of a security interest in PIK certificates.

In *Kruse* Judge Pusateri had a fact situation similar to the facts of the present consolidated cases. The debtors had granted a security interest in PIK certificates to a lender. The federal regulation governing the transfer of PIK certificates was former 7 C.F.R. § 770.6 (1983) which provided in part:

> (e) Assignments with respect to quantities of ... a commodity which can be received by a producer as payment in kind will be recognized by the Department only if such assignment is made on Form C.C.C.–479, Assignment of Payment–In–Kind, executed by the assignor and assignee, and filed with the county committee.
>
> (f) Except as provided in paragraph (e) of this section, any payment in kind or portion thereof which is due any person shall be made without regard to questions of title under state law, and without regard to any claim of lien against the commodity, or proceeds thereof which may be asserted by any creditor.

Under that regulation, the government could make any payment due on the certificate to the debtor regardless of any security interest under state law. 7 C.F.R. § 770.6(f) (1983). The question before the court was whether state law or federal law governed the perfection and transfer of negotiable documents issued under a nationwide federal program. Following *Kimbell Foods*, the court stated:

> Just as the Supreme Court held in *Kimbell Foods*, this Court believes, the state commercial codes "furnish convenient solutions in no way inconsistent with adequate protection of the federal interests...." [Citing *Kimbell Foods*.] The Court declines "to override intricate state law of general applicability on which private creditors base their daily commercial transactions." *Id.* The Court does not believe application of state law in any way hinders the Government's attempt to stabilize the supply and demand problems through PIK.

*Kruse* at 963. The *Kruse* court concluded that state law and not federal law should govern commercial transactions notwithstanding the tepid statement to the contrary in the regulation.

Similarly, in *In re Sunberg*, 729 F.2d 561 (8th Cir.1984), the Eighth Circuit declined to disregard the U.C.C. Basing its holding on the same earlier regulation as *Kruse*, the *Sunberg* court held that the federal regulatory interest in PIK crop support payments did not conflict with the state U.C.C. provisions dealing with perfection and transfer. The court stated: "Such 'anti-assignment' clauses are intended to insulate the government as benefit provider from conflicting claims over payments, not to preempt state commercial law as between third parties." *Sunberg, supra* at 563. *See also Segal v. Rochelle*, 382 U.S. 375, 384, 86 S.Ct. 511, 517, 15 L.Ed.2d 428, 435 (1966); *In re Yagow*, 62 B.R. 73 (Bankr.D.N.D.1986); *In re Preisser*, 33 B.R. 65, 67 (Bankr.D.Colo.1983); *In re Nivens*, 22 B.R. 287, 291 (Bankr.N.D.Tex. 1982). There has been no suggestion that the government's interest has changed since the 1983 program.

From the slim evidence of this regulation, the Court does not discern any overriding Congressional purpose or attempt to take over the area of security interests in government payments. Other government benefits to farmers are still subject to assignment, although it appears that they may not be assigned for preexisting indebtedness. *In re Bechtold*, 54 B.R. 318 (Bankr.D.Minn.1985). For example, many federally sponsored agricultural programs prohibit the assignment of program payments for preexisting debt. *See* 16 U.S.C. § 590h(g) (Supp.1987) (assignments of cash payments made under the Soil Conservation Act for preexisting debt are expressly prohibited). *See also* 7 C.F.R. § 709(3)(a) (1986). Yet some programs, however, do allow payments to be assigned for preexisting debt. 7 C.F.R. §§ 704.18 and 1430.464 (1986) (dairy payments can be assigned for preexisting debt). *Contra In re Azalea Farms, Inc.*, 68 B.R. 32 (Bankr.M.D.Fla. 1986) (dairy payment case decided without discussion of 7 C.F.R. §§ 704.18 or 1430.-464). PIK payments under earlier programs were held to be assignable for preexisting debt. *In re Sunberg*, 729 F.2d

561 (8th Cir.1984). 7 U.S.C. § 1444d(i) (Supp.1987); *contra, J. Catton Farms, Inc. v. First National Bank of Chicago,* 779 F.2d 1242 (7th Cir.1985); *In re Holman,* 85 B.R. 869 (Bankr.D.Kan. 1987) (Pusateri, J.).

In summary, although it is true that federal regulations may preempt state law, a federal agency's power to do so through regulation is severely limited. Congress' delegation of preemption power to the federal agency must be clearly manifested. Neither the general corporate authority of the C.C.C. nor the Food Security Act enabling language is sufficient to support the preemption of state commercial law attempted in the regulations. The Court therefore holds that the antiassignment provision of the regulation may not be used by a trustee in bankruptcy or a debtor in possession to avoid a properly perfected security interest. The preemptive provisions of the regulation purporting to invalidate state law security interests are simply unenforceable here.

## II. CLASSIFICATION OF PIK CERTIFICATES

█ Unfortunately, the conclusion that the C.C.C. regulation purporting to invalidate any state law security interest in PIK certificates is inapplicable does not resolve the dispute. The Court must still resolve the question of how one perfects a security interest in PIK certificates and what the language, "negotiable certificate redeemable in a commodity owned by the Commodity Credit Corporation," means. 7 U.S.C. § 1445b–2(a)(2)(A)(ii) (Supp.1987). *See also* 7 U.S.C. § 1445b–4(b)(3) (Supp.1987). If the certificates are in fact "negotiable," possession may be necessary to perfect an interest therein. K.S.A. 84–9–301, 9–304. If the certificates are not negotiable, filing is sufficient. K.S.A. 84–9–302.

In these cases the creditors (with the exclusion of Security Bank and Trust Company of Blackwell, Oklahoma), have filed financing statements perfecting security interests in "government payments," "contract rights" or both. The issue is not clouded by either failure to file or a filing in an inappropriate location. In all but one case (*In re George*) the actual certificates were not issued until after the debtors filed for relief under the Code and the certificates were made out to both the debtor and the trustee and apparently delivered directly to the trustee. The sole remaining issue is how a "negotiable" certificate fits within the scheme of the U.C.C. The issue is clouded by the fact that PIK certificates do not spring into existence upon the execution of the entitlement contract between the farmer and the government. As noted, in most situations the certificates are issued later.

The enabling legislation authorizes the C.C.C. to issue "negotiable certificates" and fails to specify the nature of the farmer's rights in the entitlement prior to the issuance of the actual certificate. Further, it fails to define the nature of the "negotiability" of the piece of paper so uttered.

Under the PIK program producers who plant one or more program crops (wheat, corn, grain sorghum, barley or oats), and participate in and comply with the acreage reduction and land diversion program for crops, are eligible for program benefits. Under the pre–1986 program, producers became entitled to receive a quantity (in pounds or bushels) of the same commodity by reducing the acreage of the planted crops or by withdrawing the entire crop acreage base from production and devoting this acreage to conservation usage.

As of February 1, 1986, under the farm programs the C.C.C. began issuing a "generic PIK" certificate. The U.S. Department of Agriculture issues the PIK certificates in lieu of cash to pay producers who are participating in various crop programs. The certificates are not crop specific. They carry an expiration date. The certificates can be sold for cash, often in excess of their face value. They may also be redeemed for a specific quantity of C.C.C. owned commodities. Commercial organizations buy the PIK certificates and then redeem them for C.C.C. owned commodities

**144**

by a certain date.[7]

Upon receipt of the certificate, the farmer may and usually does transfer the certificate to a purchaser for cash or to the C.C.C. to redeem a quantity of grain. "Except as provided by paragraph (f) [dealing with first transfer deadline] ... any person may transfer a commodity certificate to any other person." 7 C.F.R. § 770.4(c) (1987). The only requirements are that the transfer must be for the full amount of the certificate and be made by restrictive endorsement, signed by the transferor showing the name of the transferee and the date of the transfer. 7 C.F.R. § 770.4(c) (1987).

It is not clear from the regulations, but arguably "transfer" may include the creation of a security interest in the certificate by proper endorsement to the secured party. 7 C.F.R. § 770.4(c) (1987). However, should the secured party merely have possession of a certificate not properly endorsed to that party, the C.C.C. will not recognize it. An unendorsed transfer of PIK certificates would not be honored by the C.C.C. 7 C.F.R. § 770.4(c) (1987). However, notwithstanding the "negotiable" label, PIK certificates are not negotiable instruments or documents under the U.C.C.

The concept of negotiability is not a simple label; it is rather a specific legal doctrine which may not be adopted in a purblind manner. It has evolved over a period of time in commercial usage and is now generally a matter of statute. The Food Securities Act neither specially defines nor imports negotiability from some other statute. That failure makes the definition of a farmer's rights virtually impossible. In the absence of an appropriate federal definition, the Court will look to the U.C.C. for guidance on negotiability. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979).

The term "negotiable" is defined in the Kansas U.C.C. in several places: "negotiable instrument" is defined in K.S.A. 84–3–104; "negotiable documents of title" are defined in K.S.A. 84–7–201; and "nego-

tiable securities" are defined in K.S.A. 84–8–102 & 105. In addition, K.S.A. 84–9–105 defines "document" and "instrument."

On their face, "instrument," "document" and "security" as defined in K.S.A. 84–3–104, 7–201, and 8–102 simply do not apply to the PIK certificate ultimately issued, and clearly do not apply to the right to receive the certificate prior to issuance. K.S.A. 84–3–104(1)(b) provides:

Form of negotiable instruments; ... (1) Any writing to be a negotiable instrument within this article must

....

(b) contain an unconditional promise or order to pay a sum certain in money and *no other promise, order, obligation or power given by the maker or drawer....* (Emphasis added.)

Under K.S.A. 84–3–104(1), the section defining negotiable instruments, in order to be negotiable, an instrument must meet all the requirements as to form and content. *In re Levine*, 24 B.R. 804 (Bankr.S.D.N.Y. 1982); *see also In re Hipp, Inc.*, 71 B.R. 643, 649 (Bankr.N.D.Tex.1987); *In re Key West Restaurant & Lounge, Inc.*, 54 B.R. 978 (Bankr.N.D.Ill.1985). Since the issued generic PIK certificates are redeemable in either money *or commodities*, the right to redeem the appropriate payment in commodities does not meet the U.C.C.'s definition requiring that instruments may only be payable in money. K.S.A. 84–3–104 and 84–3–107. Thus the negotiable instrument status of the certificates is destroyed.

Further, the certificates cannot be classified as bills of lading, warehouse receipts or other documents of title. "To be a document of title a document must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass." K.S.A. 84–1–201(15) (Supp.1986). Obviously, neither the debtor nor the C.C.C. can be considered a bailee. *See In re Sabelka*, 57 B.R. 972 (Bankr.N.D.Iowa 1986).

---

**7.** Producers who participate in the U.S.D.A.'s long-term Conservation Reserve program may also receive generic PIK certificates as payment. Under that program farmers with highly erodible land agree to leave the land fallow for ten years in exchange for PIK payments.

Arguably the definition of K.S.A. 84–9–105(i) which defines an instrument as "... any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary endorsement or assignment ..." applies, but only once the certificate is actually issued. *Id.* The definition of 84–9–105(i), however, includes a cross reference to 84–3–104, thereby requiring by implication that the instruments may only be paid in money.

Simply labeling the certificate "negotiable" does not make them legally negotiable in any applicable definition of the term. PIK certificates are not negotiable documents, instruments or securities for purposes of creating and perfecting a state law security interest, and possession is not required to protect a lender.

▇▇▇ The better analysis (and indeed the accepted analysis under prior PIK regulations) is that the contractual right to an unissued PIK certificate and the certificate itself is a contract right or a general intangible requiring the creditor to file to protect its security interest. K.S.A. 84–9–106, 9–302; *Matter of Schmaling*, 783 F.2d 680 (7th Cir.1986); *In re Sunberg*, 729 F.2d 561 (8th Cir.1984); *In re Clark*, 82 B.R. 131 (D.C.D.Colo.1987); *In re Sabelka*, 57 B.R. 972 (Bankr.N.D.Iowa 1986); *cf. In re Mattick*, 45 B.R. 615 (Bankr.D.Minn.1985); *In re Binning*, 45 B.R. 9 (Bankr.S.D.Ohio 1984); *In re Liebe*, 41 B.R. 965 (Bankr.N.D. Iowa 1984); *In re Fowler*, 41 B.R. 962 (Bankr.N.D.Iowa 1984); *In re Schmidt*, 38 B.R. 380 (Bankr.D.N.D.1984); *In re Barton*, 37 B.R. 545 (Bankr.E.D.Wash.1984); *In re Kruse*, 35 B.R. 958 (Bankr.D.Kan. 1983); *cf. In re Lions Farms, Inc.*, 54 B.R. 241 (Bankr.D.Kan.1985) (payment in kind entitlements fall within the definition of "account," but not general intangible, as right for payment for services rendered under Kansas law). After issuance the PIK certificates or the payments therefrom are proceeds of the general intangible or contract rights and are subject to a properly perfected security interest in the general

intangible or contract rights. *In re Sunberg*, 35 B.R. 777 (Bankr.S.D.Iowa 1983), *aff'd.*, 729 F.2d 561 (8th Cir.1984). *But see In re Judkins*, 41 B.R. 369 (Bankr.M.D. Tenn.1984) (PIK certificates are proceeds and it is not critical error that creditor's security interest made no express mention of PIK certificates or general intangibles); *In re Lee*, 35 B.R. 663 (Bankr.N.D.Ohio 1983) (PIK payments are substitutes for crops debtor would have planted thus proceeds of debtor's crop).

To have a valid security agreement, the agreement must contain a description of the collateral. K.S.A. 84–9–203(1)(a) (Supp. 1986). Any general description which adequately identifies the collateral is sufficient for a personal property filing. K.S.A. 84–9–110. A description of the collateral for the financing statement required by K.S.A. 84–9–402 is sufficient if it makes possible the identification of the collateral. In Kansas the place for filing a security interest covering a general intangible is in the office of the Secretary of State. K.S.A. 84–9–401 (Supp.1986).

▇▇▇ Thus, PIK entitlement payments granted to farmer to forego planting a crop do not constitute proceeds of crops, but are contract rights or general intangibles. *In Matter of Schmaling*, 783 F.2d 680 (7th Cir.1986); *In re Sunberg*, 35 B.R. 777 (Bankr.S.D.Iowa 1983), *aff'd.*, 729 F.2d 561 (8th Cir.1984); *accord In re Kruse*, 35 B.R. 958 (Bankr.D.Kan.1983); *cf. United States v. Carolina E. Chemical Co.*, 638 F.Supp. 521 (D.S.C.1986) (entitlements under payment in kind program are not "proceeds" of planted crop when no crop was ever planted). Therefore, in the cases before this Court a creditor's security interest will not attach absent a specific reference to a contract right, general intangible, or specific mention of the PIK entitlement itself in the security agreement and financing statement. After issuance the PIK certificates or the payments therefrom are proceeds of the general intangible or contract right and are subject to the creditors' perfected security interests in the general intangible or contract right. Many courts in the past have been inconsistent with their classifica-

tions of government entitlement payments as collateral under the U.C.C. Such inconsistent treatment directly conflicts with the U.C.C.'s role of achieving uniformity in commercial transactions.

There are two limited exceptions, however, where unissued PIK certificates will be recognized by the Court as proceeds of planted crops. The first arises when PIK certificates are issued to the producer in substitution for crops which were originally planted and then plowed under. *In re Kruse*, 35 B.R. 958 (Bankr.D.Kan.1983); *accord In re Clark*, 82 B.R. 131 (D.C.D. Colo.1987). There is no similar situation found in the present consolidated cases. The second situation comes about when PIK certificates are issued as subsidy payments for a planted crop, i.e., the PIK certificates were issued as crop support payments to supplement the planted crop's depressed market price. *Kruse, supra,* at 965; *In re Nivens,* 22 B.R. 287 (Bankr.N.D. Tex.1982); *see also In re Munger,* 495 F.2d 511 (9th Cir.1974). This second illustration is the very situation of debtors, Clarence and Barbara Bradford, Leveta Shoffner, and Joseph and Anna Feist.

The Court accordingly holds that because PIK certificates were issued to these debtors as subsidy payments for planted crops, and because the filed financing statements of First State Bank and Trust Company of Larned, Kansas (*In re Bradford*), Security Bank and Trust Company of Blackwell, Oklahoma (*In re Shoffner*), and John Bauer Estate (*In re Feist*), included "proceeds" of the crops on the described real estate, these creditors have a properly perfected security interest in the generic PIK certificates issued to these debtors.[8] However, should any encumbered PIK certificates be issued to these debtors in the future for their participation in the government's various crop reduction programs rather than as subsidy payments, this exception will not apply.

The debtors in *George* were issued three generic PIK certificates prepetition. The label "negotiable" notwithstanding, the issued certificates constitute proceeds of general intangibles. *See In re Sunberg,* 35 B.R. 777 (Bankr.S.D.Iowa 1983), *aff'd.,* 729 F.2d 561 (8th Cir.1984). As proceeds of general intangibles, the certificates issued to the Georges prepetition remain subject to the Santa Fe Credit Union's valid perfected security interest in the sufficiently described government payments.

In these consolidated cases the creditors had properly perfected security interests in the proceeds of debtors' crops. PIK certificates which have been, or which are to be issued, to the debtors as crop subsidy payments will be recognized by the Court as proceeds of the crops and as such are properly perfected in each case. The other PIK certificates (those issued in consideration of debtors' participation in acreage reduction programs), however, are recognized by the Court as general intangibles or contract rights before issuance, and proceeds of general intangibles or contract rights after issuance. The trustees' challenges to the validity of the creditors' security interests, therefore, are overruled and a separate order will be entered directing the trustee in each case to turn over to the creditor the proceeds of the PIK certificates in issue.

The foregoing constitutes findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a) and Fed.R.Bankr.P. 7052. Separate judgments will be entered giving effect to the determinations reached herein.

---

8. The Court also recognizes creditors' (Security Bank and Trust Company of Blackwell, Oklahoma (*In re Shoffner*), and John Bauer Estate (*In re Feist*)) security interests in the respective debtors' ASCS crop deficiency payments made by check to supplement debtors' planted crops. *In re Munger,* 495 F.2d 511 (9th Cir.1974); *First National Bank v. Milford,* 239 Kan. 151, 718 P.2d 1291 (1986); *accord, In re Kruse,* 35 B.R. 958 (Bankr.D.Kan.1983).