In re Debbie June FERGUSON, Wesley Charles Conway and Claudia June Conway, David Charles Conway, Debtors.

SEMINOLE NATIONAL
BANK, Plaintiff,

v.

Myrtle McDONALD, Trustee for the Estate of Debbie June Ferguson, Defendant.

SEMINOLE NATIONAL
BANK, Plaintiff,

v.

Myrtle McDONALD, Trustee for the Estate of Wesley Charles Conway and Claudia June Conway, Defendant.

SEMINOLE NATIONAL
BANK, Plaintiff,

v.

Myrtle McDONALD, Trustee for the Estate of David Charles Conway, Defendant.

Bankruptcy Nos. 587–50218–7
to 587–50220–7.
Adv. Nos. 588–5078 to 588–5080.

United States Bankruptcy Court,
N.D. Texas,
Lubbock Division.

March 26, 1990.

Myrtle McDonald, Jones, Flygare, Galey, Brown & Wharton, Lubbock, Tex., Trustee.

Robert W. St. Clair, Curry, Curry & Robinson, P.C., Lubbock, Tex., for the Bank.

### CORRECTED MEMORANDUM OF OPINION ON COMMODITY CERTIFICATE

JOHN C. AKARD, Bankruptcy Judge.

These cases were consolidated for trial since all three involve the same trustee and the same creditor. The facts are stipulated and are summarized below. The trustee challenged the validity of the creditor's security interests on the Commodity Credit Corporation generic commodity certificate (CCC certificate) proceeds based on the theory that no state law interest can attach under the applicable CCC regulations and other grounds. The court finds the bank's liens valid.

## FACTS

### In re Ferguson

Debbie June Ferguson (Ferguson) signed a contract to participate in the Agricultural Stabilization and Conservation Services (ASCS) 1986 upland cotton program. On August 18, 1986, Ferguson borrowed $20,000.00 from Seminole National Bank (SNB) for additional 1986 farm operating capital. As security for its loan, SNB acquired a valid, duly perfected and prior (a) security interest in Ferguson's 1986 crops, all accounts, all general intangibles, and proceeds therefrom; and (b) assignment of ASCS upland cotton program payments coming due to Ferguson for the 1986 program year from farm B-449 in Gaines County, Texas. Ferguson defaulted in payment of her loan and filed for Chapter 7 bankruptcy on March 18, 1987. Ferguson was issued two CCC certificates. The first was issued February 26, 1987 and the second was issued August 15, 1987. The proceeds from redemption of the two certificates which totaled $7,381.99 were deposited in the bankruptcy estate's account.

### In re (Wesley) Conway

Wesley Charles Conway and wife, Claudia June Conway (the Conways), entered a contract to participate in the ASCS 1986 upland cotton program. SNB loaned the Conways $47,850.00 on March 31, 1986; $15,000.00 on may 16, 1986; and $20,000.00 on August 18, 1986 as additional 1986 farm operating capital. As security for these loans, SNB acquired identical valid, duly perfected and prior (a) security interests in the Conways' interests in growing crops, all accounts, all general intangibles, all farm equipments and proceeds therefrom; and (b) assignments of ASCS upland cotton and grain program payments coming due to Conways for the 1986 program year from farming operations in Gaines County, Texas. The Conways filed for Chapter 7 bankruptcy on March 18, 1987, after having defaulted on their loans. The Conways were issued eight CCC certificates. The first four certificates were issued on February 26, 1987 and the second four on

August 15, 1987. The eight certificates were redeemed for a total of $38,955.25. This amount was deposited in the bankruptcy estate's account.

### In re (David) Conway

David Charles Conway (Conway) contracted to participate in the ASCS 1986 upland cotton, peanut and grain programs. On July 22, 1986, Conway borrowed $83,-500.00 from SNB as 1986 farm operating capital. As security, SNB acquired a valid, duly perfected and prior (a) security interest in Conway's interest in growing crops, all accounts, all farm equipment, all general intangibles, and proceeds therefrom; and (b) an assignment of ASCS upland cotton, peanut and grain program payments coming due to Conway for the 1986 program year from farm B–64. Conway defaulted in payment of his loan and filed for Chapter 7 bankruptcy on March 18, 1987. Conway was issued two CCC certificates. The first was issued on March 9, 1987 and the second was issued on August 15, 1987. The net proceeds of the two certificates which totaled $20,218.43, were deposited in the bankruptcy estate's account.

### ISSUES

1. Whether federal law pre-empts SNB's prior and duly perfected state liens in Debtors' CCC certificates and their proceeds?

2. If federal law pre-empts, do the CCC regulations apply retrospectively?

### Positions of the Parties

The trustee challenged the validity of SNB's security interests on the theory that CCC regulations pre-empted state law and prohibited the attachment of any security interest in the CCC certificates. The trustee argued that not only has SNB stipulated to constructive knowledge of the proposed regulations contained in 51 Fed.Reg. 21831 (1986), but also that SNB had notice of language on the face of each CCC certificate which expressly invalidated attempts at encumbering the certificates.

SNB argued that it has a perfected security interest in the respective Debtors' crops and entitlement payments under both state law and the Bankruptcy Code. Furthermore, SNB stated that if narrowly construed, the CCC regulations do not pre-empt state law and that the regulations merely evidence an administrative intent to protect the CCC against third parties with conflicting claims to the same CCC certificates. Finally, SNB asserted that even if the CCC regulations are so broadly construed as to pre-empt state law, such construction should be given a prospective effect to prevent unconstitutional impairment of SNB's vested contractual rights.

### DISCUSSION

Originally, the CCC was created under the laws of the state of Delaware pursuant to Executive Order No. 6340, dated October 16, 1933. S.Rep. No. 1022, 80th Cong.2d Sess. *reprinted in* 1948 U.S.Code Cong. & Admin.News 2138, 2139. The Government Corporation Control Act of 1946 expressly required that any wholly owned government corporation, created by or under the laws of any state, be reincorporated by act of Congress by June 30, 1948, if such corporation was to continue as an agency of the United States. Congress enacted the Commodity Credit Corporation Charter Act of 1948 to ensure the continued existence of the CCC as a federal government agency. *Id.* The CCC was maintained for the purpose of "stabilizing, supporting, and protecting farm income and prices, of assisting in the maintenance of balanced and adequate supplies of agricultural commodities ... and of facilitating the orderly distribution of agricultural commodities...." 15 U.S.C. § 714 (1988). Today, the CCC is an agency of the United States, within the Department of Agriculture (U.S.D.A.), subject to the general supervision and direction of the Secretary of Agriculture. *Id.* It is authorized to promulgate regulations governing the administration of programs within the ambit of its statutory powers. By enacting the Food Security Act of 1985, Congress authorized the Secretary of Agriculture to use government owned commodites and negotiable certificates (redeemable in a commodity owned

by the CCC) for payments in U.S.D.A. farm programs. 7 U.S.C. § 1445b–2(a)(2)(A)(ii) (1988). Initially these negotiable certificates could be pledged. However, the CCC issued final regulations, effective October 15, 1986, providing: "Commodity certificates shall not be subject to any lien, encumbrance, or other claim or security interest, except that of an agency of the U.S. Government arising specifically under Federal statute." 7 C.F.R. § 770.4(b)(2).[1] Apparently, the CCC used 15 U.S.C. §§ 714b, 714c and 7 U.S.C. §§ 1441–1, 1444–1, 1444b, 1444b–2, 1444b–3, 1444b–4, 1445d and 1425 as its sources of authority for promulgation of § 770.[2] *See* 51 Fed.Reg. 36921 (1986).

## FEDERAL PRE–EMPTION

█ It is a fundamental precept that to the extent a conflict exists between state and federal law, state law must yield. U.S. Const. art. VI, cl.2; *Maryland v. Louisiana,* 451 U.S. 725, 747, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981). Laws enacted by Congress pursuant to the powers conferred by the Constitution are the supreme law of the land and will prevail over state law. *Testa v. Katt,* 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947).

In *Louisiana Public Service Commission v. FCC,* 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986), the Supreme Court held that:

Pre-emption occurs [1] when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, [2] when there is outright or actual conflict between federal or state law, [3] where compliance with both federal and state law is in effect physically impossible, [4] where there is implicit in federal law a barrier to state regulation, [5] where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or [6] where the state law stands as an obstacle to the

accomplishment and execution of the full objectives of Congress. (Citations omitted).

*Id.* at 368–69, 106 S.Ct. at 1898.

█ A federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation. *Id.* at 369, 106 S.Ct. at 1898. *Capital Cities Cable Inc. v. Crisp,* 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984); *Fidelity Federal Savings & Loan Ass'n v. De la Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). The critical question in any pre-emption analysis is always whether Congress intended that federal regulation supersede state law. *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947).

Section 714b, which the CCC cites as a source of its regulatory power, provides that the CCC:

(g) May enter into and carry out contracts or agreements as are necessary in the conduct of its business. State and local regulatory laws or rules shall not be applicable with respect to contracts or agreements of the Corporation or the parties thereto to the extent that such contracts or agreements provide that such laws or rules shall not be applicable, or to the extent that such laws or rules are inconsistent with such contracts or agreements.

15 U.S.C. § 714b(g) (1988).

A plain reading of § 714b(g), clearly shows that Congress did not expressly authorize the CCC to pre-empt states' secured transaction laws. *See In re George,* 85 B.R. 133, 140 (Bankr.D.Kan.1988); *In re Arnold,* 88 B.R. 917, 921 (Bankr.N.D. Iowa 1988); *In re Lehl,* 79 B.R. 880 (Bankr.D. Neb.1987) (although the court noted that "[Section] 714b(g) does not mention security interests or encumbrances," it went on

---

**1.** In 1989, § 770.4(b)(2) was renumbered and is now § 1470.4(b)(2). *See* 7 C.F.R. § 1470.4(b)(2) (1989); 53 Fed.Reg. 47, 658–59 (1988).

**2.** It appears that the correct citation for 7 U.S.C. §§ 1444b–2, 1444b–3, and 1444b–4 are 7 U.S.C. §§ 1445b–2, 1445b–3, and 1445b–4. The citation error in the Federal Register has no bearing on the court's decision.

to state that, "the CCC's [general] power to pre-empt state and local regulatory laws is sufficient authority for the more specific rule contained in Title 7, Section 770.4 of the Code of Federal Regulations."). The same conclusion is reached by reading the Food Security Act of 1985. The Act does not expressly empower the CCC to promulgate regulations pre-empting state secured transactions laws. 7 U.S.C. § 1445b–2(a)(2)(A)(ii) (1988).

■■■■ If there is no evidence of express pre-emption, then, the test of pre-emption is whether (1) the area requires national uniformity, (2) there is evidence of congressional design to pre-empt the field, or (3) the state statute actually and directly conflicts with the federal. *KVUE, Inc. v. Moore,* 709 F.2d 922, 931–32 (5th Cir.1983), *aff'd,* 465 U.S. 1092, 104 S.Ct. 1580, 80 L.Ed.2d 114 (1984).[3]

The Senate Report on § 714b(g) provides in pertinent part:

> This provision will facilitate the use by the Corporation in the carrying out of its Nation-wide programs, of standardized procedures and agreements, such as the use of storage agreements in which a uniform rate is specified, without regard to the varying rates prescribed by statute in numerous states. This provision will also enable the corporation to give insurance to its contractors that in performing their contracts with the Corporation they will not be held in violation of such State and local regulatory laws.

S.Rep. No. 1022, 80th Cong., 2d Sess., *reprinted in* 1948 U.S.Code Cong. & Admin. News 2149. Based on the above legislative history, this court understands § 714b(g) to grant the CCC the authority to promulgate regulations concerning uniform rates for its nationwide programs. The CCC's power of pre-emption, stemming from § 714b(g) only extends to those situations where "inconsistent" state "regulatory" laws directly impact the CCC and its contracts. Section 714b(g) does not cover third party contracts. The CCC "farm programs are primarily a matter between the federal government and the individual farmer." *In re George,* 85 B.R. 133, 140 (Bankr.D.Kan.1988). What use the individual farmer makes of the proceeds of a CCC program can be only of secondary interest to the CCC. *Id.* As was pointed out in *George,* Congress, where necessary, expressly limits the uses to which the proceeds of a program can be put. *See, e.g.,* 16 U.S.C. § 590h(g) (1988). Furthermore, the CCC is expressly restricted to use its general powers only in furtherance of its specific powers as listed in § 714c. These specific powers do not include pre-emption of states' commercial laws. 15 U.S.C. § 714c (1988). Therefore, third party contracts are outside the scope of the CCC's pre-emption authority.

The major goal of federal agricultural programs, including the 1985 and 1986 Acts, is to aid the ailing farm economy and to promote financial stability and certainty in the business of farming. S.Rep. No. 145, 99th Cong., 1st Sess. 1, *reprinted in* 1985 U.S.Code Cong. & Admin.News 1103, 1676. Farmers now purchase more than three-fourths of their production items from other parts of the economy, as opposed to only one-fifth, fifty years ago. S.Rep. No. 145, 99th Cong., 1st Sess. 53, *reprinted in* 1985 U.S.Code Cong. & Admin.News 1728. As a result, farmers' need for farm operating capital has increased. "Providing for credit needs of our nation's farmers and ranchers should be a joint effort between Government and the private sector." S.Rep. No. 145, 99th Cong., 1st Sess. 327, *reprinted in* 1985 U.S.Code Cong. & Admin.News 1993.

### Conclusion

■■■ This court concludes that by enacting the Food Security Acts, Congress intended to increase the farmers' borrowing ability from the private sector. In structuring its lending programs, the private sector depends "on state commercial law to provide stability essential for reliable eval-

---

**3.** This case is incorrectly styled *"KVUE, Inc. v. Austin Broadcasting Corp.",* by West Publica-

tions.

uation of the risks involved." *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 739, 99 S.Ct. 1448, 1464, 59 L.Ed.2d 711 (1979). Because the states' commercial laws furnish convenient solutions which are in no way inconsistent with adequate protection of the CCC's interests, this court declines to override state commercial laws on which private creditors base their daily commercial transactions. *Id.* at 729, 99 S.Ct. at 1459. A private lender who justifiably relies on state law to obtain superior liens should not have its expectations thwarted by the CCC through promulgation of rules which allegedly stem from the CCC's general corporate authority. Since the ultimate consequences of altering settled commercial practices are so difficult to foresee, a court should hesitate to create new uncertainties, in the absence of careful legislative deliberation. *Id.* at 739, 99 S.Ct. at 1464. Also, no important national interests need to be vindicated in this instance. Congress could not have intended that its grant of general corporate authority to the CCC be used to enable the agency to override state laws regarding secured transactions.

The overwhelming majority of courts which have considered the issue before this court, under the present or earlier law, have reached the same conclusion. *See, e.g., In re George,* 85 B.R. 133 (Bankr.D. Kan.1988); *In re Arnold,* 88 B.R. 917 (Bankr.N.D. Iowa 1988); *In re Harvie,* 84 B.R. 197 (Bankr.D.Colo.1988); *J. Cotton Farms v. First National Bank of Chicago,* 779 F.2d 1242 (7th Cir.1985); *In re Sunberg,* 729 F.2d 561 (8th Cir.1984); *In re Kruse,* 35 B.R. 958 (Bankr.D.Kan.1983); *cf. In re Mattice,* 81 B.R. 504 (Bankr.S.D. Iowa 1987); *In re Lehl,* 79 B.R. 880 (Bankr. D.Neb.1987); *In re Halls,* 79 B.R. 417 (Bankr.S.D.Iowa 1987).

Having held that the CCC regulations do not pre-empt state commercial laws, it is unnecessary for this court to address the issue of retrospective application. Furthermore, since the parties stipulated that the creditor had a valid, duly perfected, and prior security interest under the laws of Texas, this court leaves resolution of the question of how one perfects a security interest in CCC certificates for another time.

ORDER ACCORDINGLY.